That plaintiff Weyerhaeuser's motion for reconsideration is DENIED.

**WEYERHAEUSER COMPANY,**
**Plaintiff,**

v.

**KOPPERS COMPANY, INC., Defendant.**

**Civ. A. No. R–89–261.**

United States District Court,
D. Maryland.

Aug. 20, 1991.

---

Mark L. Austrian, Collier, Shannon & Scott, Washington, D.C., for plaintiff.

J. Paul Mullen, Lord and Whip, P.A., Baltimore, Md., for defendant.

## OPINION

RAMSEY, District Judge.

This case was previously before this Court on the parties' cross-motions for summary judgment. On February 1, 1991, 771 F.Supp. 1406, the Court issued a Memorandum and Order holding each party liable to the other under the strict-liability provisions of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607.[1] Weyerhaeuser was held as an owner of the contaminated property, Koppers as an operator.

---

1. In the February 1, 1991 Memorandum, the Court found as a matter of law that Weyerhaeuser owned the site at issue, that a release of hazardous materials had occurred on that site, that it was attributable to Koppers's wood treatment operations on the site, and that each party had incurred recoverable costs in response to the release. Thus, the issues remaining were limited to the proper allocation of responsibility for the clean-up and the actual dollar measure of damages.

This case was tried then before the Court on the issue of the proper allocation of this liability.[2] On February 27 and 28, 1991, witnesses, deposition excerpts, and documentary evidence were presented for the Court's consideration. Post-trial proposed findings of fact and conclusions of law were submitted by both parties, as were responses thereto. Final argument was held on May 30, 1991.

Having carefully considered the testimony and documentary evidence presented at trial, the post-trial briefs filed by the parties, and final arguments of counsel, the Court is now prepared to rule. The Court is well aware of its duty under Fed.R.Civ.P. 52(a) to make specific findings of fact and conclusions of law. Any findings of fact contained in the conclusions of law, and any conclusions of law contained in the findings of fact, shall be received in their true light.

## I. FINDINGS OF FACT

### A. *The Parties*

Plaintiff Weyerhaeuser Company is a forest products company which sells and distributes forest products including treated and untreated lumber. Sometime in 1917 or 1918, Weyerhaeuser acquired a 72 acre tract of land at 2901 Childs Street in Baltimore.

Atlantic Terminals [Atlantic] was a wholly-owned subsidiary of Weyerhaeuser and operated a public terminal on the Childs Street property from 1935 to 1977. The property was leased from Weyerhaeuser by Atlantic Terminals. Atlantic received, handled and stored lumber and provided port services for a number of different customers, although the majority of the lumber handled at the terminal was owned by Weyerhaeuser. Atlantic's prices, for all customers, were determined by public tariff. In 1976, Atlantic was dissolved and its functions assumed by Weyerhaeuser itself.

American Lumber and Treating Company [AL & T] operated wood treatment plants in a number of locations. From 1947 through 1954, AL & T leased a portion of the Childs Street property from Weyerhaeuser, erected a wood treatment plant and treated wood for a variety of customers. In 1954, AL & T transferred all its assets to Koppers and assigned the lease to Koppers as well.

Defendant Koppers Company has many lines of operation, one of which is wood treatment.[3] At the relevant time, it manufactured treatment preservatives and operated wood treatment plants, including the facility in Baltimore. Koppers operated the Childs Street facility until 1977, at which time the lease was allowed to expire and wood treatment was discontinued at that location.

### B. *Background History*

In the early 1940s, AL & T approached Weyerhaeuser with the idea of constructing a wood treatment facility in Baltimore on land leased from Weyerhaeuser. AL & T was interested in entering the Baltimore market, and saw an arrangement with Weyerhaeuser as an advantageous method of doing so. The parties had previously entered into such an arrangement in Port Newark, New Jersey.

On June 1, 1944, Weyerhaeuser and AL & T entered into a lease for a 5 acre portion of the Childs Street property. The lease was entered into for the purpose of erecting a wood treatment plant, and AL & T covenanted to erect a plant with at least two treating cylinders, "one of which shall

**2.** The parties were both aware that trial was to be so limited; this was discussed at the pretrial conference as well as at the trial. Although Weyerhaeuser did present some evidence regarding the extent of the environmental damage and the clean-up that will be required, this Court has not considered the issue of the measure of damages. As clean-up is still in the early stages, the full extent of the problem is not yet known, and appropriate response plans not yet finalized, such a dollar-and-cents determination would be premature.

**3.** In 1988, Beazer Materials and Services, Inc. acquired the liabilities associated with Koppers's operations in Baltimore. In 1989, these liabilities were passed on to Beazer East, Inc. The parties have stipulated that Beazer East will be liable for any judgment awarded against Koppers in this case.

be suitable for treatment with Wolman Salts preservative and with Minalith fire-retardant and the other of which shall be suitable for treatment with creosote preservative." The leased premises were "[t]o be used only for the purpose of treating, storing and handling lumber and other forest products[.]"

Also on June 1, 1944, Weyerhaeuser and AL & T entered into an additional "Agreement" in which AL & T again promised to erect a treatment plant as "as promptly as is reasonably practicable" and also promised to treat all lumber and forest products delivered to it by Weyerhaeuser, subject to "the facilities and capacity of said treating plant, and the other commitments of [AL & T]." Weyerhaeuser, in turn, promised to send to AL & T all the lumber shipped from Baltimore for which treatment was needed and to use "its best efforts" to promote the sale of lumber treated by AL & T.

## C. Benefits to the Parties

The entire arrangement, Lease and Agreement, was seen by both Weyerhaeuser and AL & T as mutually beneficial. Weyerhaeuser obtained treatment facilities convenient to its plant at Baltimore, and AL & T obtained the benefit of Weyerhaeuser's merchandising facilities. These anticipated benefits were explicitly stated in the June 1, 1944 Agreement.

The monetary consideration gained by Weyerhaeuser was not great. During the 33 years that AL & T and then Koppers leased the Childs Street property, Weyerhaeuser received a total of $270,000 in rent.

Nor were the non-monetary benefits anticipated fully realized. As early as 1948, AL & T wrote Weyerhaeuser about the perceived lack of orders. AL & T admitted that no particular volume of orders had

ever been guaranteed, but listed a volume it perceived as necessary for successful operation of the plants.[4]

For the years 1947 through 1952,[5] the percentage of lumber treated by AL & T for Weyerhaeuser as opposed to the percentage treated for other AL & T customers ranged from a high of 22.4 percent/77.6 percent to a low of 12 percent/88 percent. After Koppers took over operation, it continued to treat only a small percentage of wood for Weyerhaeuser as compared with other customers. Of the total amount of wood sold by Weyerhaeuser from its Baltimore facility, less than 10 percent was treated lumber.

## D. Operation of the Plant

Operation of the wood treatment plant was AL & T's—and later Koppers's—responsibility. It is not necessary to go into great detail regarding the methods of preservation and specific techniques used as the scientific evidence regarding contamination and cause was so conclusive. For this reason, the Court in its February 1, 1991 Memorandum and Order held that environmental contamination had occurred and was attributable to the operation of the wood treatment plant.[6] This is not a case involving reckless or wanton contamination, however, nor were AL & T and Koppers unduly sloppy in their work. Weyerhaeuser's wood treatment expert, a former employee of Koppers, testified that Koppers

"represented leadership in technology of wood preservation as practiced at that time, and that goes as far as technology of treatment and technology of preservatives, of maintenance of plants, care and the use of the preservatives, etc."

The Court concludes that although Koppers's wood treatment operations caused the environmental contamination, Koppers

---

**4.** AL & T was writing with reference to the cooperative ventures in place in Baltimore, Port Newark, and Everett, Washington. World War II had had a negative effect on the wood markets, but by 1948, AL & T was anticipating imminent recovery.

**5.** Excepting the year 1949, for which no data was provided.

**6.** The chemicals used to preserve the wood were transferred to the ground by dripping and dissolving.

is not to be faulted for its practices.[7] This is, of course, irrelevant to the strict liability scheme of CERCLA but is relevant to allocating responsibility among the liable parties.

Weyerhaeuser did not operate the wood treatment plant. Koppers managed the delivery, unloading, storage, and use of the chemical preservatives used at the facility; Koppers controlled the daily operation of personnel at the facility; Koppers determined how much lumber to treat at any time and where and how to store the treated lumber; and Koppers maintained the treatment cylinders.

Weyerhaeuser, however, was not ignorant of wood treatment processes. Indeed, at the time that the parties contemplated the original Lease and Agreement, Weyerhaeuser expressed concern with committing itself to promoting AL & T's processes when it was anticipating possible development of its own. Weyerhaeuser understood that the chemicals used were not benign and also accepted a certain amount of mess as intrinsic to the wood treatment process and not particularly remarkable.

### E. The Relationship Between the Parties

For the thirty-three years of the lease, the relationship between Weyerhaeuser and AL & T and then Koppers was a friendly, cooperative, business relationship. Although Koppers has repeatedly referred to the parties as joint venturers, that is an overstatement. Weyerhaeuser's and Koppers's operations in Baltimore were much more independent of each other than their operations in other cities. In Everett, Washington, AL & T's wood treatment facilities were used almost as an operating unit for Weyerhaeuser, and Weyerhaeuser utilized most if not all of plant capacity. The contrast with the Baltimore operations is marked.

As noted previously, the volume of treated lumber ordered by Weyerhaeuser was not a huge portion of the total volume of lumber treated by AL & T and Koppers. Weyerhaeuser did sell some treated lumber, however, and maintained a sales force at the Atlantic Terminals location. Weyerhaeuser had access to Koppers's brochures which extolled the virtues of wood treatment and the benefits of various types of treatment, and Weyerhaeuser used these brochures and the information contained in its own merchandising. In order to inform its sales staff, Weyerhaeuser took personnel on field trips to the Koppers plant.

In the early years, AL & T used some equipment and personnel of Atlantic and paid Atlantic for the use. Later, AL & T no longer needed to use Atlantic's resources. Atlantic personnel did continue to come onto the leased five acres in order to drop off orders for treatment and pick up orders. The Atlantic/Weyerhaeuser and the AL & T/Koppers properties were adjacent to one another, and personnel were in fairly regular contact and communication. Atlantic and Weyerhaeuser were generally aware of what was happening at the facility; the individuals on all sides maintained friendly relations.

On at least one occasion an Atlantic manager saw some dangerously stacked lumber and called the Koppers manager to warn him of the problem. Although warnings of such imminent dangers would have been made, neither Weyerhaeuser nor Atlantic personnel controlled or concerned themselves with Koppers's general safety practices or, more specifically, the safety practices regarding the treatment chemicals.

### F. The Termination of the Lease

The Lease entered into in 1944 was continually renewed until 1977. In 1977, the Lease was terminated, Koppers removed its equipment and remaining lumber and supplies and left the shell of a building standing on the property. A Weyerhaeuser employee then conducted a visual inspection of the property in order to deter-

---

7. Koppers was aware of the negative effects of the chemicals it used. These toxic properties, of course, were why these chemicals were used to preserve lumber. Nevertheless, the contain- ment methods used by Koppers, though maybe insufficient in these environmentally conscious times, were in accordance with common practices at those earlier times.

mine the physical condition of the property. By the terms of the lease, Koppers was required to "quit and surrender the premises in as good a state and condition as reasonable wear and use thereof will permit," and Weyerhaeuser approved of the condition and congratulated Koppers on its orderly withdrawal.

Weyerhaeuser's inspection was limited to visual inspection of the physical condition of the property. No environmental tests were performed nor was any possible environmental problem even contemplated. In 1977, it was not common business practice to account for possible environmental ramifications. Thus, despite seeing evidence of creosote staining on the ground, Weyerhaeuser accepted the property in the condition in which it was.

### G. Environmental Investigation

After Koppers left the property and wood treatment ceased, Weyerhaeuser leased the parcel to Hobelmann Port Services, who is not a party to this action. In 1986, Hobelmann was interested in purchasing the property but would not do so without assurances as to its condition. Accordingly, an environmental investigation was done and the presence of hazardous substances in the property was discovered. Later, other studies were done at the behest of Weyerhaeuser and of Koppers.

After the initial study, Weyerhaeuser contacted Koppers and requested that Koppers take responsibility for the investigation and clean-up. Koppers refused. After a proposal had been prepared, Weyerhaeuser again wrote to Koppers offering to cooperate in any clean-up undertaken by Koppers. Koppers again refused to accept responsibility for the problem and stuck firm to its position that any environmental problems were Weyerhaeuser's responsibility. Weyerhaeuser in turn maintained that as the problems were caused by Koppers,

Koppers was solely responsible for their resolution. After thirty-three years of cordial business relations, a singular lack of cooperation was demonstrated.

Despite Koppers's lack of cooperation, Weyerhaeuser did not let the problem languish. Further studies were done and, when it appeared that adjoining State of Maryland property might be affected by migration of the contamination, Weyerhaeuser contacted the State to apprise it of the problem.

## II. CONCLUSIONS OF LAW

### A. Apportionment of Liability

█ In *United States v. Monsanto Co.*, 858 F.2d 160 (4th Cir.1988), the Fourth Circuit held that liability under CERCLA should be joint and several in cases involving a single and indivisible environmental harm. 858 F.2d at 171–73. Liability could be apportioned, however, if (1) there are distinct harms or (2) there is a reasonable basis for determining the contribution of each cause to a single harm. *Id.* Under the Fourth Circuit's rule, divisibility is the touchstone of apportionment of liability. Other considerations are not relevant. *See* 858 F.2d at 172.[8]

█ This Court has already held that the environmental harm in this case was single and indivisible. February 1, 1991 Memorandum and Order at 1416–17. Nor is there any other reasonable basis for apportioning the liability between Weyerhaeuser and Koppers. Obviously, the hazardous substances were released because of Koppers's operation of its plant, but to hold Weyerhaeuser harmless based on a shallow cause-in-fact analysis is to completely undermine the provisions of CERCLA which impose strict liability on both the owner of the facility and the operator of the facility "without reference to whether they caused or contributed to the release or threat of

8. *See* 858 F.2d at 171 n. 22:
"The site-owners limit their joint and several liability argument to the contention that it is inequitable under the circumstances of this case, *i.e.*, their limited degree of participation in waste disposal activities at Bluff Road. As we have stated, however, such equitable

factors are relevant in subsequent actions for contribution. They are not pertinent to the question of joint and several liability, which focuses principally on the divisibility among responsible parties of the harm to the environment."

release." 858 F.2d at 170 n. 17. Accordingly, this Court must hold that Weyerhaeuser and Koppers are jointly and severally liable for the environmental damage.[9]

## B. *Allocation of Damages*

■ Holding plaintiff and defendant jointly liable under CERCLA does not end the analysis. In the statute, at 42 U.S.C. § 9613(f)(1), Congress specifically provided for actions for contribution in which equitable factors should be considered by the court.

> "Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. [ ... ] In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 or 9607 of this title."

The present posture of this case, two parties strictly, jointly and severally liable to each other, allows this Court to treat it as if it were an action for contribution and to consider the equitable factors referred to by the statute in allocating the damages between the parties.

■ In allocating damages under this section, the Court is not limited to any specific equitable factors but may consider those factors relevant to the circumstances of the case. 42 U.S.C. § 9613(f)(1). Factors which may be considered in a particular case include the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of hazardous substances. *Monsanto,*

858 F.2d at 168 n. 13. Also, the court may consider the parties' relative degree of fault. *Id.* Other factors which have been gleaned from the legislative history of CERCLA and considered by the courts are:

1. The ability of the parties to distinguish their contribution to the discharge, release, or disposal of hazardous waste;

2. The amount of the hazardous waste involved;

3. The degree of the toxicity of the hazardous waste involved;

4. The degree of care exercised by the parties with respect to the hazardous waste concerned; and

5. The degree of cooperation by the parties with government officials to prevent any harm to the public health or the environment.

*United States v. A & F Materials Co., Inc.,* 578 F.Supp. 1249, 1256 (S.D.Ill.1984). Considerations more relevant to the present case are the benefits received by the parties from the contaminating activities and the knowledge and/or acquiescence of the parties in the contaminating activities. *See South Florida Water Management District v. Montalvo,* No. 88–8038 (S.D.Fla. Feb. 15, 1989), Hazardous Waste Litigation Reporter, 14303 (Andrews, April 3, 1989).

Weyerhaeuser and Koppers have both referred to two unofficially reported cases which dealt with the issue of allocating damages between an owner and an operator of a CERCLA facility, parties to whom the more traditional allocation factors (such as individual contribution) do not apply[10]: *Montalvo,* cited above, and *BCW Associates Ltd. v. Occidental Chemical Corp.,* No. 86–5947, 1988 WL 102641 (E.D.Pa., September 29, 1988), Hazardous Waste Litigation Reporter, 13606 (Andrews, November 21, 1988). The Court finds the reasoning of both of these cases persuasive.

---

**9.** It is instructive to note that when discussing the reasonable basis for apportioning liability among responsible parties, the Fourth Circuit was speaking in terms of the "generator defendants," 858 F.2d at 172, that is the operators of the facility, not the owners, although owners were present in the case. This suggests that the

contribution-to-the-harm analysis may not be applicable in apportioning liability among different *classes* of defendants though it can be quite useful in distinguishing between defendants in the same class.

**10.** *See supra* note 9.

In *Montalvo,* the court discussed the owner's knowledge of the contaminating operations and understanding of the risks involved. The court also found, however, that the owner had not benefitted financially from the contamination of the land as it had paid a price as if for non-contaminated land. The operator, on the other hand, was the only source of the contamination so was assessed with "the lion's share" of the burden, or 75 percent. The owner, by virtue of its acquiescence, was held responsible for 25 percent.

In *BCW,* the court was influenced by the fact that the owner of the property had benefitted financially from the clean-up as it had paid only for a dusty warehouse "as is" and was now the owner of an environmentally safe property. For these reasons, the court assessed the owner with one-third responsibility.[11]

■ In this case, Koppers's operations were the sole cause of the environmental damage. For this reason alone, Koppers must be allocated the lion's share of the responsibility. The fact that the lease had expired and Koppers had ceased operation ten years before is no defense to CERCLA liability.

However, Weyerhaeuser itself also comes under the shadow of CERCLA and must therefore bear the attendant burden. Weyerhaeuser not only knew of and acquiesced in Koppers's wood treatment activities but in fact required them as a condition of the Lease and Agreement: if the facility had not been built as anticipated or if treatment had not been undertaken, Weyerhaeuser would have been able to terminate the lease upon short notice.[12] Weyerhaeuser may not have benefitted so much as had been originally anticipated, but Weyerhaeuser did obtain some benefit from the proximity of Koppers operations totally aside from the rent paid under the lease.

Weyerhaeuser was not duped by Koppers, was not an innocently, unsuspecting landlord. Both Weyerhaeuser and Koppers, in good faith, were content with Koppers's maintenance and use of the property. As it happens, that maintenance was not sufficient to prevent the release of hazardous materials, but this was an event equally unanticipated by both sides.

Thus, while Koppers must take greater responsibility than Weyerhaeuser, Weyerhaeuser is also responsible. Having considered all of the aspects of the case, the arguments on both sides, and the equities involved, this Court holds that an allocation of responsibility of 60 percent to Koppers and 40 percent to Weyerhaeuser is a fair and proper resolution of this matter.

No dollar disposition is made. The Court anticipates that the parties will confer and resolve the specific damage amounts within the guidelines set by in this opinion. If this proves to be impossible, then consideration of the propriety of the costs incurred and their consistency with the National Contingency Plan may be necessary.

Both sides have also requested award of their attorneys' fees as recoverable response costs. Without holding on the issue of fees as an item of CERCLA damages, the Court declines to award them. Transference of fees is not appropriate in a case involving corporate equals sharing CERCLA liability as do these parties. Accordingly, the respective percentages set out above shall not apply to attorneys' fees, and each side shall bear its own fees.

### III. ORDER

In accordance with the forgoing Opinion, it is this 20th day of August, 1991 by the United States District Court for the District of Maryland,

ORDERED:

That of the response costs incurred and appropriately recoverable under CERCLA, 42 U.S.C. § 9607(a), plaintiff shall be liable

---

11. The party who had actually caused the contamination was assessed with another one third, and the current occupant/lessee was charged with the last third as it too had received financial benefit from the clean-up.

12. This was explicitly provided in the agreements between the parties.

for forty percent (40%) and defendant shall be liable for sixty percent (60%).