**ENVIRONMENTAL TRANSPORTATION SYSTEMS, INCORPORATED,** also known as Environmental Transportation Services, Incorporated, an Oklahoma corporation, and Canal Insurance Company, a South Carolina corporation, Plaintiffs–Appellants,

v.

**ENSCO, INCORPORATED,** an Arkansas corporation, both individually and as successor in interest to Energy Systems Company, an Arkansas corporation, and Northern States Power Company, a Minnesota corporation, Defendants–Appellees.

Nos. 91–1847, 91–2216.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 22, 1992.
Decided July 30, 1992.

Robert J. Noe, Bozeman, Neighbour, Patton & Noe, Moline, Ill., William D. Pettigrew, argued, Linda G. Alexander, Niemeyer, Noland & Alexander, Oklahoma City, Okl., for Canal Ins. Co., Environmental Transp. Systems, Inc. in No. 91–1847.

Gabriel M. Rodriguez, argued, Sheldon A. Zabel, Schiff, Hardin & Waite, Chicago, Ill., Willis Conkhite, III, Little Rock, Ark., for Ensco, Inc., Energy Systems Co., and N.S.P. Co.

Robert J. Noe, Bozeman, Neighbour, Patton & Noe, Moline, Ill., Linda G. Alexander, Kenneth D. Upton, Jr., William D. Pettigrew, argued, Niemeyer, Noland & Alexander, Oklahoma City, Okl., for Canal Ins. Co., Environmental Transp. Systems, Inc., in No. 91–2216.

Before COFFEY and KANNE, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

HARLINGTON WOOD, Jr., Senior Circuit Judge.

Environmental Transportation Systems, Incorporated and its insurer, Canal Insurance Company, appeal the district court's decision to allocate to Environmental Transportation Systems, Incorporated the entire cost of cleaning up a spill of polychlorinated biphenyl dielectric fluid arising from a single vehicle accident that occurred on an Illinois interstate highway interchange ramp in November 1984. 763 F.Supp. 384 (C.D.Ill.1991). Environmental Transportation Systems, Incorporated and Canal Insurance Company brought a contribution action contending that ENSCO, Incorporated and Northern States Power Company are responsible for some of the cleanup costs because both entities are strictly liable under the Comprehensive Environmental Response and Liability Act. Environmental Transportation Systems, Incorporated also contends that ENSCO, In-

corporated is partially at fault for the spill for allegedly failing to comply with certain Department of Transportation regulations. We affirm the district court's decision.

## BACKGROUND FACTS

In 1984 Northern States Power Company ("Northern States") contracted with ENSCO, Incorporated ("ENSCO"), an Arkansas waste disposal firm, to remove and dispose of approximately 100 out-of-service electrical transformers containing polychlorinated biphenyl ("PCB") dielectric fluid.[1] At that time ENSCO had an agreement with Environmental Transportation Systems, Incorporated ("ETS"). Under the agreement ETS provided tractors, flat-bed trailers equipped with spill-containment measures, and drivers. ETS also provided all necessary insurance.

The agreement between ENSCO and Northern States provides that the transformers would be shipped to ENSCO's disposal facility without first draining the transformers of the PCB-laced mineral oil they contained. The transformers were not packaged in any special manner for shipment. They were loaded onto ETS trucks by crane. The ETS trailers were modified by welding a lip around the outer edge of the flat-bed trailer in order to create a tub around the transformers. The tub did not contain any absorbent material. Presumably it was hoped that the tub would contain any PCBs that happened to leak out of the transformers during shipment. All of these specifications were negotiated between Northern States and ENSCO; ETS did not participate in the decision to haul the PCB-filled transformers to the disposal site instead of first draining the transformers and then hauling the PCBs in a tank truck.

On November 9, 1984, Ronald Fresh, an ETS driver, was hauling a load of three Northern States transformers on a modified flat-bed trailer. Fresh exited Interstate 74 and was entering Interstate 80 near Moline, Illinois when he lost control of his rig. When Fresh drove onto the interchange, he did not know the road had an "S" curve, so after negotiating the first curve he found he was not in proper position to get around the second one. He ended up driving off the road, and the truck flipped over on its side. One of the transformers punctured a second one and approximately 100 gallons of PCBs spilled. Fresh testified in a deposition that an Illinois state trooper arrived at the accident site within fifteen minutes. The state trooper issued Fresh a citation for driving too fast for conditions, and Fresh later pleaded guilty to the charge.

After the accident state troopers kept Fresh for two hours before they finally allowed him to call his contact at ETS. ETS in turn notified ENSCO because ETS did not have the capability to make the proper response. An emergency response unit from ENSCO arrived after several hours. Cleanup of the site took place over the next few months. ENSCO paid for and supervised this cleanup.[2] Northern States did not help in the cleanup, nor did it bear any of the costs associated with cleaning up the spill.

ETS submitted a claim to its insurer, Canal Insurance Company ("Canal"), for the amount of ETS's reimbursement to ENSCO. Canal did not honor the claim. Eventually three lawsuits arising out of litigation between ETS and Canal were settled, and Canal agreed to pay approximately half of ETS's claim. During the litigation, ETS's vice-president, David Kennedy, stated in an affidavit that the "sole cause of the accident was the vehicle being driven at an excessive speed as it attempted to negotiate a curved exit/access ramp." Kennedy also concluded after conducting an investigation of the accident:

---

**1.** As Environmental Transportation Systems notes in its brief, PCBs are a group of chemicals produced between 1929 and 1977 used primarily as cooling liquids in electrical equipment. PCBs are among the most hazardous man-made chemical substances.

**2.** Although ENSCO paid for the cleanup itself, ETS reimbursed ENSCO by offsetting ENSCO's cleanup costs against money ETS was to receive from ENSCO for hauling other loads.

Based upon the investigation performed by ETS, it has no basis in fact to assert that anyone else other than its own employee [Fresh, the driver] is responsible for the accident and the resulting PCB spill. ETS has determined the speed of its driver was excessive for the conditions and posted limits. There is no indication inclement weather was present or contributed in any way to the accident. Kennedy was installed as vice-president after the accident, and he made these conclusions solely by reviewing records of the accident.

In January 1989, ETS and Canal (hereafter collectively referred to as "ETS") filed a lawsuit against ENSCO and Northern States. In the count relevant to this appeal, ETS demanded from ENSCO and Northern States pro rata shares in contribution for cleanup costs under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). ETS moved for summary judgment on July 17, 1990, asserting that ENSCO and Northern States were liable as a matter of law under CERCLA and that the court should apportion cleanup costs equally among the parties because the parties' relative responsibility could not be diffused in any objective fashion.

ENSCO and Northern States filed a cross-motion for summary judgment on August 27, 1990. They argued that even if they were liable under CERCLA, the section of CERCLA concerning contribution directs the court to take into account equitable factors, including the relative fault of the parties. In replying to ENSCO's and Northern States's cross-motion, ETS admitted that courts may take into account the relative fault of the parties in apportioning liability under CERCLA. ETS then asserted improper loading of the transformers onto the truck caused the spill, not that Fresh was driving too fast. In support of this assertion, ETS cited certain Department of Transportation regulations that were allegedly not complied with. However, ETS submitted no expert testimony or lay opinion to support its theory that improper loading of the transformers rather than the fact that Fresh was driving

too fast to negotiate the curve in the road caused the accident.

On March 12, 1991, the district court held that ENSCO and Northern States were liable parties under CERCLA. However, the court concluded that CERCLA liability does not necessarily lead to mandatory contribution for cleanup costs. The district court concluded that ETS was responsible for all of the costs of cleanup because the accident was entirely ETS's fault. In coming to this conclusion, the district court decided that EPA regulations under the Toxic Substances Control Act ("TSCA") and not regulations under the Transportation Safety Act ("DOT regulations") applied to the transportation of PCBs. Consequently, any possible violation of the DOT regulations was irrelevant to a finding of fault. The district court further decided that ENSCO had complied with the relevant TSCA regulations and that ETS had put forth no evidence to rebut ENSCO's evidence that the spill was entirely ETS's fault.

ETS now comes to this court to appeal the district court's judgment.

## ANALYSIS

Section 9613(f) of Title 42, United States Code, provides that any person may seek contribution from any other person who is liable or potentially liable under CERCLA, 42 U.S.C. §§ 9601 *et seq.* As the district court noted, to establish a defendant's liability under CERCLA, a four-part test must be met: (1) the site in question is a "facility" as defined by CERCLA; (2) the Defendant is a "responsible person" for the spill as defined by CERCLA; (3) there was a release of hazardous substances; and (4) such release caused the Plaintiff to incur response costs. *Environmental Transportation Systems, Inc. v. ENSCO, Inc.,* 763 F.Supp. 384, 387 (C.D.Ill.1991) (citing *United States v. Aceto Agr. Chemicals Corp.,* 872 F.2d 1373, 1378–79 (8th Cir. 1989)). The district court concluded that the four-part test was met in this case and that ENSCO was liable for contribution under CERCLA, and the district court granted ETS's motion for summary judg-

ment on that issue. If a plaintiff establishes each of the four elements and the defendant is unable to establish one of the defenses listed in § 9607(b),[3] the plaintiff is entitled to summary judgment on the liability issue. *See Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir.1989).

On appeal ETS argues it sought only partial summary judgment on the issue of ENSCO's liability; however, ETS's motion clearly indicates ETS also sought resolution of the contribution issue, arguing that under CERCLA ENSCO was liable for an automatic pro rata assessment in contribution as the only equitable result. In response, ENSCO filed a cross-motion for summary judgment asserting that the facts in the record clearly established ETS was entirely at fault for the spill and should therefore be held responsible for the full cost of the cleanup. ETS countered, admitting that pro rata contribution did not have to automatically follow from strict liability under CERCLA and raising for the first time that ENSCO was partially at fault for the spill by failing to follow applicable DOT regulations.

The district court resolved ETS's motion on ENSCO's liability in ETS's favor. However, the court disagreed with ETS's argument that once a party is liable under CERCLA that party is automatically liable for a pro rata assessment of cleanup costs. The court stated that finding a party a "responsible party" under CERCLA does not mean that all parties involved in a spill are equally responsible and should share costs on a pro rata basis. Such a finding, the district court determined, means only that a party is *potentially* liable for contribution under CERCLA, as 42 U.S.C. § 9613(f)(1), the section of CERCLA concerning contribution actions, specifically in-

structs the court to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." The court then resolved ENSCO's cross-motion for summary judgment against ETS. The court allocated the total costs of cleanup to ETS after determining that there was no genuine issue of material fact as to whether the accident was entirely the fault of ETS's driver, Ronald Fresh. This appeal arises only from the district court's decision on the contribution issue.

As this is an appeal from the grant of a motion for summary judgment, our review is *de novo*. Summary judgment in favor of ENSCO is appropriate only if, when viewing the evidence in the record in the light most favorable to ETS, no genuine issue of material fact exists and ENSCO is entitled to judgment as a matter of law.

■ While section 9613(f)(1) directs courts to allocate costs of cleanup between responsible parties "using such equitable factors as the court determines are appropriate," that section does not limit courts to any particular list of factors, nor does the section direct the courts to employ any particular test. ENSCO argues section 9613(f)(1) has been widely recognized to allow courts to consider the relative fault of the parties in allocating response costs among the parties liable for a spill. ETS says the issue is not so clear and argues there are at least two different methods which could be used to address the problem of contribution under CERCLA—a pro rata assessment of costs and a comparative culpability notion focusing on several factors including relative fault.[4]

■ CERCLA was originally enacted without any provision for contribution. Before CERCLA was amended to provide an

---

3. To establish a defense to CERCLA liability a "person" must show by a preponderance of the evidence that the release or threat of release of a hazardous substance and the resulting damages were caused solely by—(1) an act of God; (2) an act of war; or (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant....

4. In its brief, ETS also discusses a method of allocation based solely on fault. ETS does not cite any cases in which a court allocated cleanup expenses based solely on fault, except the instant case. However, as we will explain more fully, while relative fault of the parties may have been the *determining* factor in this case, the district court was not required to limit itself to this single issue.

express right of contribution among liable parties several courts discussed equitable factors that courts might look to in order to "apportion" CERCLA liability. *See United States v. Chem–Dyne Corp.*, 572 F.Supp. 802 (S.D.Ohio 1983); *United States v. A & F Materials Co., Inc.*, 578 F.Supp. 1249 (S.D.Ill.1984); *United States v. Conservation Chemical Co.*, 628 F.Supp. 391 (W.D.Mo.1985). These discussions often focused on whether the court would or would not impose joint and several liability under CERCLA, not what the equitable shares of persons jointly and severally liable to the government should be. An example is *United States v. A & F Materials Co., Inc.*. In that case the court listed six factors which could be evaluated in order to determine whether or not joint and several liability should be imposed. The factors the court discussed are:

(i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

(ii) the amount of the hazardous waste involved;

(iii) the degree of toxicity of the hazardous waste involved;

(iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

(v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and

(vi) the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment.

578 F.Supp. at 1256. These six factors originally were part of an amendment to the 1980 House Superfund Bill which did not pass. Congressman Albert Gore proposed the criteria as a moderate approach to joint and several liability, and the six criteria are often referred to as the "Gore Factors." Under the Gore Amendment the court had the power to impose joint and several liability when a defendant could prove his or her contribution to an environmental injury; however, a court could also look to the criteria in order to apportion damages. 578 F.Supp. at 1256.

Now there is an express right of contribution under CERCLA in section 9613(f). The legislative history of section 9613(f) cites the *A & F Materials* decision's criteria as factors courts may consider in deciding whether to grant apportionment in a contribution action. *See* H.R.Rep. No. 253, 98th Cong., 2nd Sess., pt. 3, at 19 (1985), U.S.Code Cong. & Admin.News 1986, pp. 2835. The legislative history also states, "[o]f course, the burden of proof is on the defendant or party seeking apportionment to establish that it should be granted. *United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 810 (S.D.Ohio 1983)." *Id.* The *Chem–Dyne* decision, however, refers to "apportionment" in terms of divisibility for the defendant seeking to avoid joint and several liability as opposed to apportionment in terms of contribution. Our task in this case is how to apply reasoning from cases whose joint and several liability rationale is really very different from the context of a contribution action. There can be no right to contribution unless there is joint and several liability, but the cases cited in the legislative history are discussions of the equity of applying joint and several liability in the first place.

In recent decisions courts have stated that the language and legislative history of the new contribution section indicates, at the very least, Congress's intent that courts should equitably allocate costs of cleanup according to the relative culpability of the parties rather than an automatic equal shares rule. *See, for example, United States v. Monsanto Co.*, 858 F.2d 160, 173 n. 29 (4th Cir.) *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989) (stating "the language of CERCLA's new contribution provisions reveals Congress's concern that the relative culpability of each responsible party be considered in determining the proportionate share of costs each must bear"). Thus, in this case, ETS's assertion that ENSCO's liability under CERCLA leads to a pro rata allocation of cleanup costs because there is no other

equitable method of allocation disregards the courts' power to weigh and consider relevant factors, including fault, in order to effectuate Congress's intent. The district court here rejected pro rata apportionment as "patently inconsistent with the dictates of CERCLA." 763 F.Supp. at 388. There may be cases in which pro rata apportionment in a contribution action is appropriate, and the district court's statement should not be interpreted to preclude such apportionment under section 9613(f) in all cases. However, we support the district court's statement to the extent that it construes section 9613(f) as not requiring courts to adopt pro rata assessments of contribution once a party is determined to be liable under CERCLA.

Although ETS urges this court to enumerate specific factors to be considered by courts making an equitable determination to allocate cleanup costs in contribution, we feel it is unnecessary to do so. First, the language of section 9613(f) clearly indicates Congress's intent to allow courts to determine what factors should be considered in their own discretion without requiring a court to consider any particular list of factors. Second, the allocation of cleanup costs is a type of decision particularly suited to case-by-case determination— just as the decision to hold defendants jointly and severally liable to the government in CERCLA actions has been and continues to be made on a case-by-case basis. *See Chem–Dyne,* 572 F.Supp. at 808; *see also,* H.R.Rep. No. 253, 98th Cong., 2nd Sess., pt. 3, at 19 (1985) (indicating that many aspects of the new right to contribution should be resolved by the courts on a case-by-case basis pursuant to federal common law).

We have already pointed out the Gore Factors listed in *A & F Materials* as possible considerations for making an equitable allocation decision, but we emphasize that the Gore Factors are neither an exhaustive nor exclusive list. Like the Court of Appeals for the Sixth Circuit, we think a court may consider any factors appropriate to balance the equities in the totality of the circumstances. *See United States v. R.W. Meyer, Inc.,* 932 F.2d 568 (6th Cir.1991). And as examples, we catalog several federal court decisions listing factors to be possibly considered under section 9613(f)(1): *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192 (2d Cir.1992) (court may consider an array of factors including the financial resources of the parties involved); *CPC International, Inc. v. Aerojet–General Corp.,* 777 F.Supp. 549 (W.D.Mich.1991) (listing responsible party's degree of involvement in disposal of hazardous waste, amount of hazardous waste involved, and degree of care exercised by the parties as factors to consider in a contribution action); *Weyerhaeuser Co. v. Koppers Co.,* 771 F.Supp. 1420, 1426 (D.Md.1991) (indicating as important factors the benefits received by the parties from contaminating activities and the knowledge and/or acquiescence of the parties in the contaminating activities); and *United States v. Bell Petroleum Services, Inc.,* (available on WESTLAW ELR database), 1990 U.S.Dist. LEXIS 14066, *9 (W.D.Tex. July 24, 1990) (court is not limited to apportionment in a contribution action on the basis of fault).

ETS maintains the district court erred in granting summary judgment on the contribution issue in ENSCO's favor because the district court decided the issue solely based on the relative fault of the parties. Clearly, relative fault is one factor that can be considered in making an equitable determination under section 9613(f)(1), and ETS does not deny this. Rather, ETS asserts there should have been, at the very least, an evidentiary hearing on the relative fault of the parties.

Before we address ETS's concerns, we first point out that in enumerating the different factors that courts could possibly consider in making equitable allocations we are in no way requiring or even suggesting that courts must make specific findings as to each factor we have mentioned. Therefore, in any given case, a court may consider several factors, a few factors, or only one determining factor, as the district court did in this case, depending on the totality of circumstances presented to the court. Be-

cause allocation of cleanup costs can be based on many equitable factors on which there may be much competing evidence leading to material issues of fact, the issue of contribution may not always be suited to disposition by summary judgment. *See, for example, United States (EPA) v. Environmental Waste Control, Inc.*, 698 F.Supp. 1422 (N.D.Ind.1988) (citing *Bowyer v. United States Dept. of Air Force*, 804 F.2d 428 (7th Cir.1986) (for purposes of Resource Conservation and Recovery Act liability summary judgment generally is inappropriate where the parties disagree about inferences reasonably to be drawn from undisputed facts). Nevertheless, ETS is not relieved of its burden to meet the evidence ENSCO presented supporting its summary judgment motion (that the spill was entirely the fault of ETS driver Fresh) with evidence raising a genuine issue of material fact as to either the fault issue or some other equitable factor that district court could consider in order to decide how to allocate costs. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (motion for summary judgment may not be defeated with evidence that is merely colorable or is not significantly probative).

■ ETS strenuously argues that the accident was not the fault of its driver alone; rather, ETS says its driver stated in an affidavit that improper weight distribution caused the truck to overturn. Furthermore, ETS argues that even if its driver alone was responsible for the accident, the *spill* of PCBs was caused, at least in part, by ENSCO's failure to comply with DOT regulations concerning the transportation of hazardous materials. The district court concluded that Fresh's statement concerning the manner in which the truck was loaded does not create a genuine issue of material fact over what caused the accident when considered in context of ENSCO's evidence. We agree with the district court that those statements "say only that once Fresh had driven off the pavement due to his excessive speed, the momentum of the heavy trailer rig tipped his truck over." 763 F.Supp. at 389–90.

■ ETS's second argument, regarding ENSCO's compliance (or noncompliance) with DOT regulations, deserves more discussion. Compliance with applicable regulations concerning transportation of hazardous substances is surely an equitable factor to consider under section 9613(f), for compliance with industry regulations in an indication of the degree of care a party exercises with respect to hazardous substances. *See A & F Materials*, 578 F.Supp. at 1256 (listing Gore Factor (v) regarding the relative degree of care exercised by the parties). ETS submits ENSCO was partially responsible for the spill, if not the accident, because neither EPA regulations nor DOT regulations specify whether transformers may be transported for disposal while still containing PCB-laden oil. ENSCO rejoins that EPA regulations under TSCA, which focus on manufacture, processing, use, distribution in commerce and disposal of PCBs, clearly allow transformers to be shipped while still laden with PCBs. Moreover, ENSCO argues that the DOT regulations that ETS now relies upon do not prohibit shipment of transformers filled with PCBs. The district court agreed with ENSCO, stating first that EPA regulations and not DOT regulations applied in this case and stating second that ENSCO complied with the relevant EPA regulations.

The relevant TSCA regulations are found at 40 C.F.R. § 761.20. Section 761.20(a) states: "No persons may use any PCB, or any PCB Item regardless of concentration, in any manner other than in a totally enclosed manner...." Section 761.20 also specifies the distribution in commerce of intact, nonleaking electrical transformers as a totally enclosed activity. As ENSCO points out the term "commerce" is defined in 40 C.F.R. § 761.3 as trade, traffic, transportation or other commerce between a place in a state and any place outside of that state, and the definition of "disposal" contained in the same section includes actions related to transporting and destroying PCBs. ENSCO says these regulations clearly support its assertion that the TSCA regulations allow PCB-filled transformers to be transported to a waste facility, and

we agree. ETS's reading of these regulations, that TSCA allows the sale or delivery for sale of intact, nonleaking transformers and its concomitant transportation but does not allow the same transportation for purposes for disposal, is simply too strained.

The DOT regulations ETS says are applicable to this case are found at 40 C.F.R. § 173.12.[5] Section 173.12 sets out exceptions from other specification packaging requirements of the subchapter; if a substance is listed as excepted in section 173.-12, the substance is subject only to general packaging requirements of the subchapter. Like the district court, we think that any pertinent DOT regulations should apply to this case in tandem with pertinent EPA regulations. However, the district court also decided that to the extent to which the DOT and the EPA regulations conflict, only the EPA regulations applied.

PCBs are "hazardous substances" for purposes of the DOT regulations. They are listed in the Appendix to 49 C.F.R. § 172.101. Although ETS argues PCBs are "hazardous wastes" for purposes of the DOT regulations, they are not. "Hazardous waste" for purposes of chapter 49 is material subject to the Hazardous Waste Manifest Requirements of 40 C.F.R. § 262. *See* 49 C.F.R. § 171.8. And, 40 C.F.R. § 261.8 specifically states, "disposal of PCB-containing dielectric fluid and electric equipment . . . regulated under part 761 of this chapter . . . are exempt from regulation under parts 261 through 265, and parts 268, 270, and 124 of this chapter." Therefore, if the DOT regulations applied at all,

only the regulations pertaining to PCBs as hazardous substances applied.

Because PCBs are listed in the Appendix to 49 C.F.R. § 172.101, they are classified as "other regulated material" or "ORM–E." The packaging requirements of chapter 49 relevant to ORM–E materials are set forth in 49 C.F.R. § 173.510, which then directs that packaging of ORM–E materials be in accordance with the "Standard requirements for all packages." *See* 49 C.F.R. § 173.24. These regulations are detailed, but they do not specifically regulate PCBs for shipment.[6] Rather, the regulations are performance standards for materials falling into the classification of ORM–E.

Although ETS refers us to these sections of the DOT regulations, ETS submits no evidence indicating that the transformers in which the PCBs were shipped do not conform with the DOT standards. In fact, the only evidence in the record could reasonably lead to the opposite inference—namely, that the shipment *did* meet the specifications. This is because one regulation ETS cites, 49 C.F.R. § 171.2(a), states:

> No person may offer or *accept* a hazardous material for transportation in commerce unless that material is properly classed, described, packaged, marked, labeled, and in condition for shipment as required or authorized by this subchapter.

ETS accepted the load with the PCB-filled transformers; thus, a court could reasonably infer that ETS must have thought the load was in compliance or else ETS would have rejected the load.

---

5. ENSCO points out that the section 173.12 exceptions to specification packaging requirements were added as an amendment to section 173 on March 25, 1985, and did not become effective until April 22, 1985—months after the November 22, 1984, accident. However, the underlying substantive packaging regulations were in effect before the accident.

6. 49 C.F.R. § 173.24 **Standard requirements for all packages** reads in part:

(a) Each package used for shipping hazardous materials under this subchapter shall be so designed and constructed, and its contents so limited, that under conditions normally incident to transportation:

(1) There will be no significant release of hazardous materials to the environment;
(2) The effectiveness of the packaging will not be substantially reduced; and
(3) There will be no mixture of gases and vapors in the package which could through any credible spontaneous increase of heat or pressure, or through an explosion, significantly reduce the effectiveness of the packaging.

(b) Materials for which detailed specifications for packaging are not set forth in this part must be securely packaged in strong, tight packages meeting the requirements of this section.

**512**

Because ETS has presented no evidence demonstrating that ENSCO did not comply with the DOT regulations, we do not have to decide whether, in case of a conflict, which regulations "trump" as the district court did. The record shows ENSCO complied with the relevant EPA regulations, and the record contains admissions by ETS's driver and ETS's vice-president that the accident which caused the PCBs to spill was entirely the fault of ETS. Neither party submitted evidence supporting other equitable factors besides fault that the district court could have considered in making the allocation decision. It is clear that the district court could consider fault in making the allocation decision. And, there is no genuine issue of material fact concerning who caused the accident. Therefore, we believe that the district court appropriately granted summary judgment. Had ETS submitted an affidavit concerning whether or not ENSCO complied with the DOT regulations, or evidence tending to show that the accident would not have happened had the truck been loaded differently, or evidence explaining ETS's assertion in its reply brief that ENSCO "actually made a profit," (for such evidence would be relevant to the relative financial resources of the parties involved, *see B.F. Goodrich*, cited *supra* ) this might be a different case. But, ETS did not, and if it is to defeat ENSCO's summary judgment motion ETS must meet ENSCO's evidence with more than conclusory allegations that have no factual support. Our review of the record does not reveal inferences contrary to those drawn by the district court, so summary judgment should be affirmed.

## CONCLUSION

The judgment of the district court granting summary judgment in ENSCO's favor is

AFFIRMED.