**ALCAN–TOYO AMERICA, INC., Plaintiff,**

v.

**NORTHERN ILLINOIS GAS COMPANY and Commonwealth Edison Company, Defendants.**

**No. 92 C 7142.**

United States District Court, N.D. Illinois, Eastern Division.

March 27, 1995.

Lawrence A. Salibra, II, Alcan Aluminum Corp., Cleveland, OH, Neil S. Ament, Wheeling, IL, for plaintiff Alcan–Toyo America, Inc.

Susan M. Franzetti, Mary Beth Cyze, Roy M. Harsch, Hilary F. Herbst, Gardner, Carton & Douglas, Chicago, IL, for defendant Northern Illinois Gas Co.

Maureen M. Crough, Sidley & Austin, Robert Martin Olian, Sidley & Austin, Chicago, IL, for defendant Commonwealth Edison Co.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

This is a private action for recovery of response costs brought under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601, *et seq.* Plaintiff and defendants move this Court to allocate costs to be incurred from the clean up of hazardous substances at plaintiff's facility in Joliet, Illinois. For the reasons stated herein, I find that the defendants are jointly responsible for 90 percent of any future costs incurred in the clean-up of plaintiff's facility, and that the plaintiff is responsible for 10 percent of future clean-up costs.

### Facts

Plaintiff, Alcan–Toyo America, Inc. ("Alcan–Toyo"), currently owns a thirty-seven acre site located in Joliet, Illinois ("the Site"). In 1912, the Site was purchased by Coal Products Manufacturing Co. ("CPMC"), which built and operated a coal processing plant there. The coal processing plant produced manufactured gas and by-products such as coal tar. In 1931, CPMC was dis-

solved, and its assets and liabilities were assumed by Western United Gas & Electric Company ("Western United"). Western United continued to produce manufactured gas and by-products at the Site. Through a series of corporate mergers, defendant, Commonwealth Edison Company ("ComEd"), later became the owner of the Site. In 1954, defendant, Northern Illinois Gas Company ("NiGas"), purchased the Site from ComEd. In the course of coal processing operations, the defendants and their corporate predecessors deposited coal tar at the Site. Coal tar contains hazardous substances within the meaning of CERCLA § 101(14), 42 U.S.C. § 9601(14).

In 1967, Intercontinental Alloys Corporation ("IAC") purchased the Site from NiGas and operated a secondary aluminum smelter there. The secondary aluminum smelter did not produce or use coal tar. In 1976, Alcan Aluminium Limited ("Aluminium") purchased fifty percent of IAC stock, which it later exchanged with Alcan Aluminum Corporation ("Alcancorp") for shares of Alcancorp stock. In 1979, Alcancorp purchased the remainder of IAC stock. In January, 1981, IAC was dissolved, and its remaining assets and liabilities were assumed by Alcancorp. In 1987, Alcan–Toyo was formed as an independent joint venture corporation between Alcancorp and Toyo Aluminum K.K. ("Toyo"), a subsidiary of Aluminium. In July, 1987, Alcan–Toyo acquired ownership of the Site from Alcancorp. The Site is presently owned and operated by Alcan–Toyo for the manufacture of aluminum powders and pastes. The aluminum powders and pastes manufacturing process does not produce or use coal tar. Beginning in 1989, extensive soil and groundwater investigations were conducted at the Site to determine the environmental impact of the former coal processing operations. These investigations revealed the presence of coal tar on the Site. Subsequently, Alcan–Toyo excavated approximately two thousand cubic yards of coal tar contaminated soil, which was stockpiled on the Site for subsequent treatment and/or land disposal.

On October 27, 1992, Alcan–Toyo brought this action pursuant to 42 U.S.C. §§ 9607, 9613(f)(1) seeking to recover costs incurred in response to the release and threatened release of hazardous substances from the Site into the environment. The parties now move this Court to allocate response costs.

### Discussion

Liability is established under CERCLA if the following four-part test is satisfied:

(1) the site in question is a "facility" as defined in § 101(9);

(2) the defendant is a responsible person under § 107(a);

(3) a release or a threatened release of a hazardous substance has occurred; and

(4) the release or the threatened release has caused the plaintiff to incur response costs.

*Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir.1994) (citations omitted). In the present case, the parties have stipulated to each of these factors: the Site is a "facility" within the meaning of CERCLA; Alcan–Toyo, NiGas, and ComEd are all "responsible persons;" and a release or threatened release of hazardous substances has occurred at the Site, causing Alcan–Toyo to incur response costs. *See* Stipulation of Facts and Agreed Procedural Matters ("Stip."), ¶¶ 4, 14–16, 18–20. Accordingly, the only issue to be resolved is the allocation of response costs between the parties.[1]

CERCLA specifically provides for contribution claims among potentially liable parties:

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) ..., during or following any civil action under section 9606 ... or under section 9607(a) of this

---

1. The parties ask this Court to allocate only future clean-up costs among them. Accordingly, the Court does not reach the issue of whether Alcan–Toyo is entitled to recover past response costs incurred. Stip., ¶ 4; Plaintiff's Brief, p. 2 n. 1. In addition, the defendants, ComEd and NiGas, have agreed that this Court should not allocate response costs between them. Accordingly, liability upon either NiGas or ComEd will be imposed on each jointly and severally. Stip. ¶ 6; Defendants' Joint Brief, p. 1.

title. Such claims ... shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

42 U.S.C. § 9613(f)(1). The language of this provision manifests a clear legislative intent "to allow courts to determine what factors should be considered in their own discretion without requiring a court to consider any particular list of factors." *Environmental Transportation Systems, Inc. v. Ensco, Inc.,* 969 F.2d 503, 509 (7th Cir.1992). Accordingly, the Seventh Circuit has declined to set forth an exhaustive list of factors to be applied by district courts in contribution actions brought under CERCLA. *Id.* However, the Court of Appeals has suggested a number of possible considerations to guide this analysis, including the relative fault of the parties, relevant "Gore factors,"[2] the financial resources of the parties involved, the benefits received by the parties from contaminating activities, and any contracts between the parties bearing on the allocation of clean-up costs. *Kerr-McGee Chemical Corp. v. Lefton Iron & Metal Co., supra,* 14 F.3d at 326 (citations omitted); *Environmental Transportation Systems, Inc. v. Ensco, Inc., supra,* 969 F.2d at 509 (citations omitted).[3]

■ A primary consideration in allocating costs is the concept of relative fault. *See Environmental Transportation Systems, Inc. v. Ensco, Inc., supra,* 969 F.2d at 508–09 ("courts should equitably allocate costs of cleanup according to the relative culpability of the parties rather than an automatic equal shares rule"); *United States v. Monsanto Co.,* 858 F.2d 160, 173 n. 29 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989) ("the language of CERCLA's new contribution provisions re-

veals Congress' concern that the relative culpability of each responsible party be considered in determining the proportionate share of costs each must bear"). As former owners and operators of the Site, the defendants do not contest that they and their corporate predecessors are responsible for the generation and initial disposal of coal tar at the Site. Stip. ¶¶ 14, 19. Indeed, none of the subsequent owners or operators introduced coal tar to the Site: IAC operated a secondary aluminum smelter on the Site after acquiring ownership from NiGas in 1967. After the dissolution of IAC, Alcancorp continued to operate the secondary smelter, and Alcan-Toyo, after acquiring ownership of the Site from Alcancorp in 1987, expanded its operations to include the manufacture of aluminum powders and pastes. Neither of these operations used or produced coal tar. Stip. ¶¶ 7, 12.

■ Nevertheless, the defendants insist that Alcan-Toyo also "disposed" of hazardous substances under CERCLA by excavating and stockpiling coal tar materials on the Site. CERCLA defines the term "disposal" as:

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

*See* 42 U.S.C. § 9601(29) (adopting the definition set forth in Section 1004 of the Solid Waste Disposal Act, 42 U.S.C. § 6903(3)). Defendants read this definition to encompass the excavation and stockpiling of previously-introduced hazardous materials on the Site.

There is some support for a broad reading of the term "disposal." In *Ganton Technolo-*

2. Six considerations, originally part of an amendment to the 1980 House Superfund Bill which did not pass, were proposed by then-Congressman Albert Gore as a moderate approach to joint and several liability. *Environmental Transportation Systems, Inc. v. Ensco, Inc., supra,* 969 F.2d at 508. These criteria are often referred to as the "Gore factors." *Id.*

3. In enumerating these considerations, the Seventh Circuit admonished that

we are in no way requiring or even suggesting that courts must make specific findings as to each factor we have mentioned.... [I]n any given case, a court may consider several factors, a few factors, or one determining factor ... depending on the totality of the circumstances presented to the court.

*Environmental Transportation Systems, Inc. v. Ensco, Inc., supra,* 969 F.2d at 509.

gies, Inc. v. Quadion Corp., 834 F.Supp. 1018 (N.D.Ill.1993), contractors were hired to clean up existing polychlorinated biphenyl contamination at a die casting facility, but instead exacerbated the problem by polluting previously uncontaminated areas of the facility. Id. at 1021. Finding that the contractors could be liable under CERCLA as operators of a facility "at which ... hazardous substances were disposed of," see 42 U.S.C. § 9607(a)(2), the Court construed the term "disposal" to include a dispersion of hazardous materials which exacerbates a pre-existing contamination. Id. at 1021–22. Similarly, in Kaiser Aluminum & Chemical Corp. v. Catellus Development Corp., 976 F.2d 1338 (9th Cir.1992), a former property owner brought a CERCLA claim against an excavator who allegedly exacerbated the extent of a chemical contamination by extracting contaminated soil from an excavation site and spreading it over uncontaminated areas of the property. Id. at 1342. The Ninth Circuit reversed the dismissal of the action, holding that these allegations were sufficient to support the claim that the excavator was liable under CERCLA because it "disposed" of a hazardous substance within the meaning of 42 U.S.C. § 9607(a)(2). Id.; see also Tanglewood East Homeowners v. Charles–Thomas, Inc., 849 F.2d 1568, 1573 (5th Cir.1988).

In this case, the defendants have presented no evidence to suggest that the excavation and stockpiling of coal tar contaminated soil has in any way exacerbated the pre-existing contamination at the Site. Alcan–Toyo maintains that the contaminated soil has been temporarily stored in a confined pile, tarped above and below, while awaiting off-site disposal. Affidavit of Peter S. Segretto, Ph.D., ¶¶ 4, 6, 9. This arrangement would appear to create less potential for migration and leaching of contaminants into the soil and groundwater than had Alcan–Toyo left the contaminated soil in the ground. Id., ¶ 9. Furthermore, the record indicates that the

area in which the contaminated soil is stockpiled had already been contaminated with coal tar prior to the excavation and stockpiling. In the autumn of 1990, the contaminated soil was excavated from the northwest portion of the Site and stockpiled in the northeastern corner. See O'Brien & Gere Preliminary Site Characterization Summary ("O'Brien & Gere"), pp. 17–18, 23. Analyses of soil in the northeastern corner of the Site in 1989 revealed the presence of purification wastes, including coal tar, cinders, slag, and wood debris, as well as trichloroethylene, a common industrial degreaser. O'Brien & Gere, pp. 14–15, 24; Dames & Moore May 1, 1990 letter, pp. 1, 3–4. Accordingly, the evidence does not show that Alcan–Toyo's activities exacerbated the contamination. There is, therefore, no basis for finding that Alcan–Toyo "disposed" of hazardous substances at the Site.[4]

■ Defendants also argue that Alcan–Toyo should bear some of the response costs because it assumed the risk of liability by acquiring the Site in 1987, seven years after the enactment of CERCLA, without conducting environmental due diligence. Defendants add that Alcan–Toyo's failure to perform an environmental assessment prior to acquiring the Site is especially egregious in light of the fact that coal tar was visible on surface soils and that very old industrial buildings stood on the Site in 1987. Alcan–Toyo responds that Alcancorp acquired an ownership interest in the property in 1976, four years before CERCLA was enacted, and that Alcan–Toyo's acquisition of the Site from Alcancorp in 1987 was essentially "a sale to itself" and that it did not shift the risk of liability from the corporate parent.

■ Although CERCLA does not permit equitable defenses to liability under Section 107, equitable factors such as laches, unclean hands, estoppel, or caveat emptor may be

---

4. This conclusion is supported by recent decisions that narrowly interpret "disposal" in CERCLA actions. See, e.g., United States v. Petersen Sand and Gravel, Inc., 806 F.Supp. 1346, 1350–53 (N.D.Ill.1992); Brookfield–North Riverside Water Commission v. Martin Oil Marketing, Ltd., No. 90 C 5884, 1992 WL 63274, at *8–10 (N.D.Ill. Mar. 12, 1992); United States v. CDMG Realty Co., 875 F.Supp. 1077, 1081–86 (D.N.J. 1995); Ecodyne Corp. v. Shah, 718 F.Supp. 1454, 1456–57 (N.D.Cal.1989); In re Diamond Reo Trucks, Inc., 115 B.R. 559, 565 (Bankr. W.D.Mich.1990).

considered in the allocation of contribution shares. *Town of Munster, Indiana v. Sherwin–Williams Co., Inc.,* 27 F.3d 1268, 1270–71 (7th Cir.1994); *Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86, 90 (3rd Cir.1988), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989); *see also* Steven B. Russo, *Contribution Under CERCLA: Judicial Treatment After SARA,* 14 COL.J.ENV.L. 267, 286 (1989) ("many federal courts do consider common law equitable defenses such as unclean hands and *caveat emptor* as mitigating factors in deciding liability for response costs. This approach is in line with Congressional intent as long as courts do not consider these equitable defenses to be a total bar to a liability action …")

> Under the doctrine of *caveat emptor,* the original rule was that, in the absence of express agreement, the vendor of land was not liable to his vendee, or a fortiori to any other person, for the condition of the land existing at the time of transfer. As to sales of land this rule has retained much of its original force, and the implied warranties which have grown up around the sale of chattels never have developed. This is perhaps because great importance always has been attached to the deed of conveyance, which is taken to represent the full agreement of the parties, and to exclude all other terms and liabilities. The vendee is required to make his own inspection of the premises, and the vendor is not responsible to him for their defective condition, existing at the time of transfer.

RESTATEMENT (SECOND) OF TORTS § 352 cmt. a (1965). The Illinois Supreme Court has repeatedly acknowledged that Section 352 of the Restatement expresses the law in Illinois. *See Century Display Manufacturing Corp. v. D.R. Wager Construction Co., Inc.,* 71 Ill.2d 428, 17 Ill.Dec. 664, 666, 376 N.E.2d 993, 995 (1978) (citing *Sparling v. Peabody Coal Co.,* 59 Ill.2d 491, 322 N.E.2d 5 (1974)). *Accord, Philadelphia Electric Co. v. Hercules, Inc.,* 762 F.2d 303, 312 (3rd Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337

(1985) ("[I]n the sale of realty this doctrine [*caveat emptor*] not only applies, it flourishes.") (citing M. FRIEDMAN, CONTRACTS AND CONVEYANCES OF REAL PROPERTY § 1.2(n), at 37 (4th ed. 1984)).

Under the doctrine of *caveat emptor,* Alcan–Toyo bore the burden of any defect in the property it purchased; accordingly, it had the responsibility to undertake a careful inspection of the Site prior its purchase of the property. Alcan–Toyo concedes that neither it nor Alcancorp performed environmental investigations of the Site before 1989.[5] Although Alcan–Toyo excuses its failure on the ground that CERCLA did not exist at the time Alcancorp acquired the property, in the absence of CERCLA it bore the entire risk of environmental contamination under the doctrine of *caveat emptor.* It will also reap the benefits of the environmental clean-up of its property. Under these circumstances, I conclude that Alcan–Toyo should bear some responsibility for the response costs. *Accord, South Florida Water Management District v. Montalvo,* No. 88–8038–CIV–DAVIS, 1989 WL 260215, at *3–4 (S.D.Fla. Feb. 15, 1989); *In re Sterling Steel Treating, Inc.,* 94 B.R. 924, 931 (Bankr. E.D.Mich.1989).

Although I have concluded that Alcan–Toyo should bear some of the cost as a result of its ownership of the property, the defendants and their corporate predecessors are wholly responsible for introducing the contaminants to the Site. Accordingly, defendants are appropriately held responsible for most of the response costs. I find that ComEd and NiGas are jointly responsible for 90 percent of any future costs incurred in the clean-up of the Site, and that Alcan–Toyo is responsible for 10 percent of future costs incurred.

---

**5.** Investigations in 1989 noted visible coal tar at several locations on the Site. It is not clear how long this situation existed.