**GOULD, INC., Plaintiff,**

v.

**A & M BATTERY & TIRE SERVICE, et. al., Defendants.**

No.  Civ. 3:CV–91–1714.

United States District Court, M.D. Pennsylvania.

Sept. 4, 1997.

John M. Armstrong, Schnader, Harrison Segal & Lewis, Cherry Hill, NJ, Dennis R. Suplee, Philadelphia, PA, for Plaintiff.

Donald B. Mitchell, Washington, DC, Michael H. Malin, Philadelphia, PA, Laurel A. Bedig, Washington, DC, Richard J. Brickwedde, Syracuse, NY, for Defendants.

## ALLOCATION OF COSTS

CONABOY, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

By Order dated January 28, 1997, (Doc. 1579), this Court bifurcated the trial of this case into four (4) phases.[1] On Monday, February 24, 1997, the Court conducted the first day of the non-jury trial. Thereafter, the Court held sixteen (16) court days of testimony concerning the allocation of response costs among the plaintiffs and defendants. In accordance with Fed.R.Civ.P. 52(a), the following constitutes this Court's findings of fact and conclusions of law.

The present findings of fact and conclusions of law deal specifically with Phase II of

1. Phase I of the trial was to determine the liability of the named plaintiff and the named defendants. Phase II was to determine the allocation of response costs among the original parties. Phase III was to determine the liability and allocation of response costs of the third party defendants to the third party plaintiffs found liable.

the trial, the allocation phase. The Court has heard lengthy testimony and many witnesses and has received extensive evidence on what the parties wish the Court to consider in determining the manner and mathematical method by which our decision is to be made on how the responsibility for the damages should be allocated between the plaintiff and the defendants.

## FINDINGS OF FACT

This action was commenced on December 23, 1991. The plaintiff, Gould, Inc., initiated this action pursuant to the Comprehensive Environmental Response, Compensation and Liability Act, (hereinafter "CERCLA"), 42 U.S.C. § 9601 et seq. A total of 235 defendant suppliers were originally named in this action. Thirty-seven (37) active defendant battery suppliers remain.

## I. THE MARJOL YEARS

### A. Early Beginnings of the Site

The Marjol Battery & Equipment Company (hereinafter "Marjol") operated a battery breaking facility (hereinafter "the site") from 1961 until 1980 in the Borough of Throop, Lackawanna County, Pennsylvania. Gould, Inc. (hereinafter "Gould") acquired the site from Marjol on May 7, 1980. Larry Fiegleman was the president and sole shareholder of Marjol until the time the operation was acquired by Gould.

Gould, Incorporated, a corporation which is incorporated under the Delaware corporate law and has its principle place of business in Eastlake, Ohio, is a corporation in the business of electronics. Gould also has a metals division.

The site is located uphill from a surrounding residential area. The land surface slopes from east to west, and is comprised of 43.9 acres of land which includes a 7.7 acre primary battery casing material fill area, strip

Phase IV shall address and determine the total amount of the response costs incurred in this case.

Judgment on the issue of liability has been issued on a large number of defendants. Therefore, only a small number of parties still remain.

pits, an operational area and approximately 20 acres of wooded terrain. The operation itself contained temporary stockpile areas, a battery house, several storage bins, an acid treatment plant, a melting pot, a storage building, a storage shed, a maintenance garage, an office and a scale.

### B. History Of The Process Of Lead Extraction And Marjol's Operations

In the 1960's, the battery breaking business was a common industry. Batteries, essentially from automobiles, were in common supply in the United States. The batteries consisted of an exterior shell or casing that contained a series of positive and negative lead plates which were activated by the addition of a mixture of sulphuric acid and water. In an effort to salvage certain materials, it became necessary to break the batteries, and any salvageable portion, especially the lead, would be extracted.

In the beginning, batteries were broken with an ax. Subsequently, the batteries would be heated so that the rubber or tar-like cover of the battery cells would melt and the cells could then directly be pulled out.

As time progressed, so did the method of lead extraction. Those involved in the battery breaking industry implemented the guillotine or hydrocleaver to break the batteries. By using this method, battery breakers were able to break open up to four (4) batteries at a time.

In the late 1960's, a polypropylene container replaced the rubber or tar-like casing. The guillotine and ax method became more difficult and less effective in removing the battery tops, so high speed saws were utilized. Use of the high speed saws also caused more acid to spill and it was harder to control fugitive emissions. As a result, slow speed saws came to replace high speed saws, as fugitive emissions were easier to control and acid spills were lessened with the slow speed saws.

In the mid 1970's, Marjol melted down lead parts and posts and connectors. The melted parts would be stored in barrels, and the barrels would be stored on site until a full load was ready for shipment. The melting took place at the old crusher building and melting pot, which was connected to the bag house; an emissions control device which filtered any emissions coming off the pot. The melting pot was not always connected to the bag house, and this lack of connection at times caused the release of fugitive emissions into the atmosphere. The operation of the melting pot eventually stopped, after the Department of Environmental Resources informed Marjol that it should suspend all melting activities immediately.

MA Industries, a Georgia company whose prime product was polypropylene plastic liners for manhole covers, began experiencing a shortage of polypropylene. In order to solve this shortage, MA Industries developed a machine to crush the empty battery boxes which were discarded by the battery breakers. This process was commonly known in the industry as the MA machine, or the MA process. The MA machine implemented large, long hammers which were dropped onto a slated table which held batteries. The hammers would crush the battery parts held in between the table crevices.

Eventually, Marjol began using the MA process which utilized a liquid water separation method, in which the solid lead, lead oxide and rubber parts would fall to a tank and would be removed by a chain conveyor. The rubber parts would float to the top of the water, were picked up by a small chain conveyor, and were fed into a fan which blew the plastic parts into a trailer.

Due to the nature of the business itself, it was inevitable that lead was released into the atmosphere. The battery breaking business, by its nature, is a dirty business and in its early years the methods used were crude and resulted in particles, dust and fumes spreading over the land of those in the business and being carried off site either through air or by water, causing damage in surrounding neighborhoods.

An average car battery weighs approximately forty (40) pounds and contains twenty-two (22) pounds of lead. A battery breaker could recapture between 98% and 99% of the lead from a spent battery. Given this recapture rate, between 1,430,000 and 2,860,-

000 pounds of lead were not recovered annually at the site.

Marjol's methods were typical of the average breaker during its time of operation, having utilized all of the above mentioned processes for battery breaking and lead extraction at one time or another during its operations. However, technological advancement and size of the operation was anything but typical. Marjol was possibly the largest independent battery recycler in the United States in the mid 1970's, processing between 15,000 to 25,000 batteries a day, whereas a typical battery processing plant would process between 3,500 and 5,000 batteries a day. Estimates of the amounts processed at the site during its operation range from 929,574,-549 to 1,201,305,722 pounds of batteries. Marjol utilized advanced sophisticated methods to break open the batteries in an effort to accelerate processing.

Most of the operations took place at the front of the property. Upon entering the site, trucks carrying spent batteries proceeded to the area of the office and scale. The load of batteries was weighed on a scale and transferred to the battery house. Many of the battery suppliers sent their batteries to Marjol because they knew what was entailed in breaking batteries, and did not want to perform such activities on their own site.

Ludmilla Varzaly, the bookkeeper for Marjol, would receive a slip of paper and a weight slip from the truck driver, indicating to which customer the driver belonged. Once she received a weigh-back slip (a slip indicating the weight of the load taken at the site's scales), an invoice slip would be written out, indicating the customer's name, the date of pick up, the identity of the load, the price and the dollar value. She would then await a "price per pound" amount from either Larry Fiegleman, the owner of Marjol, or Anthony Bonodio, the general manager of Marjol. Upon receipt of that information, a slip was drafted, and the slip would then be placed in the customer's unpaid file. Once the unpaid bill was going to be paid, checks were drafted and signed by Lawrence Fiegleman and/or Anthony Bonodio.

Shortly after the aforementioned intake process, Ludmilla Varzaly would also enter into the journals or ledgers (hereinafter the "Varzaly ledgers") the battery shipments received from different parties. Such entries included the name or abbreviation thereof, the date, the weight of the shipment, the check number and the dollar value of the purchased batteries. She would often abbreviate the names of the companies when she did the ledger entries, so "it would be easier." She "could do more, enter more, shortcut." She would be able to fit more information on the ledger. Sometimes she would use the first name of the corporate name or she would only write the first half of a long corporate name.

There are three (3) gap periods for which there are no Varzaly ledgers: 1961 through May of 1969; June 1970 through May 1971; and June 1976 through May 1979. All of the yearly designations were for the fiscal years.

In addition to the Varzaly ledgers, Marjol also kept general ledgers. The general ledgers would show the monthly total amounts purchased by Marjol. The general ledgers did not indicate from whom the batteries were purchased.

Once the tops of the batteries were removed at the battery house, the batteries were removed from the battery house by a chute. At the end of the chute, Marjol employees would literally dump the batteries, turning them upside down on a grated table in order for the lead plates to fall out. The battery cases were then thrown out to the back of the building.

When the battery tops were removed, acid was also released from the batteries. During the early years of operations, the acid was allowed to drain onto the earthen floor, and was then discharged onto the site after being neutralized with lime. The earthen floor was eventually replaced with a concrete floor, and in the mid 1970's an acid treatment plant was built to neutralize the waste acid.

The battery house and acid treatment plant were connected by a chute, from which acid would leak on its way to the acid treatment plant. Although DER records indicated that the acid which was dumped down the chute drained into the Lackawanna River, Lawrence Fiegleman believed that this did

not happen. He was of the opinion that "they (DER) never proved that it (the battery acid) was going there". He claimed, "what happened was, there was a lot of rock in [the gully]. And when that stuff (the acid) would go through the rocks, it would ... come out clean on the other end. Wherever it went, it went. It went into the ground." (Fiegleman deposition, 10/22/94; p. 68).

The site also contained an erosion gully which carried battery casings and lead off the site. The battery casings contained lead and lead residue. The erosion gully drained into Sulphur Creek.

Battery casings were stockpiled in large ravines and pits remaining from the strip mining activities on the northeastern part of the site. In the mid to late 1970's, the battery casings eventually were buried, and the pits were filled in with contaminated soil. The soil, which had been removed in order to reach the underlying coal seam, became contaminated because it was left on site after having been extracted from the ravine. As a result, battery casings were buried in the strip pits, and were covered by contaminated soil. Once these strip pits were filled, battery casings were placed down slope to the south.

In the battery breaking industry, during the 1960's and 1970's, battery casings were typically either buried or crushed on site at some time after the lead was extracted. The casings were stored in an area on the sites, and bulldozers were run over the casings in order to crush them and reduce their size.

Over time, piles of battery casings at the Marjol site were permitted to grow in excess of the sides of the storage bins which had been erected for storage purposes. Lengths of the piles ranged from 150 feet to 250 feet. At times, the piles were too large to be covered. In the early years of operation, the disposed battery cases were not washed, so lead residue remained in the disposed battery casings. Eventually, Marjol began to wash the disposed battery casings, but some lead still remained. Lead was carried around and off of site from these piles by air,

and rain water caused lead to be defused throughout the site and to the nearby Lackawanna River by run off water.

## C. Contamination Of The Site And Surrounding Properties

The above described operations caused acid and lead spills. Such spills created potential hazards, and did cause lead particulate and acid to be distributed not only onto the site of the operations, but also onto adjoining private properties. Off site contamination occurred due to fugitive dust from the battery breaking and handling operations, the melting pot located on site, wind blowing over the site's contaminated ground surface, wind blowing over the piles of stored battery casings, the backfilling of strip pits with battery casings and contaminated soils, and filling low areas with battery casings. Lead particulate was also carried off site by tires on the trucks leaving the site, as well as surface water run off from the battery piles.

Initially, those in the business and general public were neither aware nor concerned of the dangers of lead, especially to persons. But those concerns began to surface in the late 1960's and early 1970's, and the concerns became so real that government regulators began to enforce and develop new regulations and to impose restrictions on battery breaking businesses around the country. The Pennsylvania DER was on the cutting edge of environments regulation and its air pollution control program was one of a few of its kind in the country. During this time, air pollution regulation was brand new. As there was no perceived need for such equipment that regulated air pollution at that time, battery breakers had no true system to utilize in controlling fugitive emissions.

In the 1960's, the Pennsylvania Department of Environmental Protection (then the Department of Environmental Resources)[2] began receiving complaints about emissions from the site. Residents complained that their white wash would turn black before drying once it was hung on the clothesline.

---

2. DER was formed in 1970. Prior to its inception, all of the environmental services that became part of DER were performed by other

departments, among them being the Air Pollution Control Association.

Investigations ensued shortly thereafter. Although Lawrence Fiegleman claimed that he never received any complaints concerning the neighbor's laundry, he dismissed other complaints that he did receive. He felt certain neighbors did not like him or the presence of his business, and therefore thought the numerous complaints were grounded solely in personal animosity towards him.

### 1. *the 1969 order*

In May, 1967, the Air Pollution Control Association began working with Marjol on the abatement of lead particulate problems resulting from the site's operations. Sampling results indicated that the site was causing a lead problem in the surrounding area and that the sampling yields were cause for serious concern. Lawrence Fiegleman disputed the Association's sampling results, and contended that certain residents were tampering with the sampling structures, as there was animosity between him and the residents. At some point, James Chester, Regional Air Pollution Control Engineer and Secretary to the Association prior to DER's creation, determined that some of the samplers were in fact tampered with by the residents. The results of any sampler thought to have been tampered with were discarded or were not taken into consideration by DER.

At a 1968 meeting with James Chester, Lawrence Fiegleman indicated that he was desirous of creating an acceptable program under which lead emissions would be controlled by a closed system for lead melting. An order was entered by the Bureau of Air Pollution Control on March 7, 1969, ordering Marjol to reduce the emission of particulate matter from the site so that any emissions would not be detectible outside the site's property line. Marjol was also directed to submit a compliance plan which would comport with said order.

After three (3) notifications that Marjol was in violation of the 1969 order for not submitting a compliance plan, said plan was still not submitted by Lawrence Fiegleman or Marjol's attorney. A subsequent inspection to the site found no control equipment was installed. Marjol was fined $300 for violating the 1969 order. Marjol appealed this fine, but later withdrew its appeal in lieu of an agreement to submit a compliance plan before November 1, 1970.

James Chester visited the site on November 5, 1970, at which time he determined that Marjol was in violation of the November 1, 1970 deadline for the 1969 order. Instead of the suggested installations being made, he determined that Marjol was constructing an entirely new production operation. Rather than controlling the original source of emission, Marjol was creating another source of emission by building new buildings and adding new production lines while keeping the original source in operation. Six (6) subsequent visits to the site revealed that control installations were not complete. On December 6, 1971, Marjol plead nolo contendere to two of the criminal charges that it had violated the 1969 order by repeated non-compliance.

On January 22, 1972, John Wilkes, Air Pollution Control Engineer, and Paul Gronka, an industrial hygienist for DER, visited the site. They discovered that holes had been cut into the duct work of one of the machines. Such actions negated the equipment's ability to effectively work. The holes were cut in order to speed up the processing of batteries. Such actions raised concern because it was the first time that any company in the state had engaged in such conduct. As a result of this, DER officials agreed to step up enforcement and investigations against Marjol, visiting the site from every two weeks to every month.

In December of 1970, published reports indicated that Marjol was the number two air polluter in Pennsylvania. Lawrence Fiegleman was aware of such accounts, but dismissed such reports as "another big lie", and believed that DER was lying.

### 2. *blood lead tests, atmospheric samplings and the cease operations request*

In March of 1975, atmospheric samplings were conducted within a one-half mile radius of the site, including neighboring residences. Such samplings yielded results which DER

considered health threatening. At this time, there were no accepted standards to indicate what ambient readings were safe and what readings were unsafe.

DER invoked the assistance of the Pennsylvania Department of Health in order to determine whether such readings posed a threat to public health. Blood lead tests were performed on children in the area, and test results revealed that several children had blood lead levels in excess of the limit for lead content as established by the Centers for Disease Control.

In accordance with department policy, the test results were sent to Marjol and Lawrence Fiegleman. He was informed that Marjol's operations were causing air pollution resulting in lead exposure in the neighboring residential area that was severe and beyond safe health limits. DER formally requested that all lead handling and processing operations be suspended until the source of emission was determined.

Lawrence Fiegleman's response to these statements was that DER had not proven anything. He did not think that "anything was wrong" with lead. He claimed that lead was not hazardous to one's health or to the environment: "Lead is the type of material that will go through your body. It will not stay." He indicated that, in his opinion, "whoever ... says that lead is hazardous to somebody's health, whoever the person may be, that's their opinion. My opinion is that it isn't. I've been around it all my life."

Lawrence Fiegleman remained steadfast in his opinion that lead was not hazardous either to one's health or to the environment.

Marjol did not comply with DER's cease operation request, for Lawrence Fiegleman thought that "legally, Marjol wasn't doing anything wrong." He felt that if DER thought that what Marjol was doing was as hazardous as it had indicated, then DER would have gotten a court order and closed the site.

At this time, animosity between Lawrence Fiegleman and James Chester became worse. Letters complaining about James Chester were written by Marjol's attorney to Chester's superiors at the Department of Health and the Governor of Pennsylvania. Counsel for Marjol was of the opinion that James Chester was overstepping his bounds and was creating a "state of hysteria" in the Borough of Throop. Throughout James Chester's strained relationship with Lawrence Fiegleman, he was subjected to threats, ethnic slurs and attempted retaliations for his investigations of the site. Lawrence Fiegleman also contends that he was the brunt of ethnic slurs as well from James Chester. Their relationship remained strained. Lawrence Fiegleman was antagonistic, recalcitrant and uncooperative. He was inflexible and stubborn in his belief that lead was harmless.

Nothing came of Marjol's complaints concerning James Chester.

### 3. *the 1976 order*

From November to December 1975, site inspections were performed. Five visits revealed uncovered storage piles. (Tr. Vol. IX, 03/11/97; p. 27–8). After samplings from neighboring residences yielded results in excess of 5 part micrograms per cubic meter ($ug/m$ 3) [3] and after having taken into consideration the blood lead test results, DER issued another order dated January 27, 1976. Said order directed Marjol to, *inter alia*, cover all exposed battery casing piles and storage piles not in use, vacuum all paved areas and roadways, and take any other measures necessary to reduce the site's soil lead content to acceptable standards. This order primarily dealt with basic housekeeping issues necessary to prevent emissions. All management and housekeeping provisions were rudimentary and did not require invention of any new technology.

Marjol submitted a general compliance plan, under which Lawrence Fiegleman stated that the battery casing piles were being covered with soil, and that lead storage piles were being covered with plastic. Marjol's general attitude toward the 1976 order was to comply with the order, and Marjol made some attempt at compliance with the order. However, subsequent visits to the site re-

**3.** At this time, 5 $ug/m$ 3 was the estab-   lished limit for lead concentration of soil.

vealed a general lack of housekeeping, dusty pavement and battery scraps spewn across the site. Bins containing battery materials were uncovered, and the material pile rose above the top of the bins. (Tr. Vol. IX, 03/11/97; 39–41).

### 4. the 1977 order

On July 26, 1977, DER issued another order to Marjol, directing it, *inter alia,* to not add any new piles of or add to the existing piles of battery cases, to cover the existing piles on site, and to begin removal of the battery cases. Subsequent visits to the site revealed that the piles were either partially covered, (defendants' exh. no. 284, 289; Tr. Vol IX, 03/11/97, p. 56), totally covered (defendants' exh. no. 284, 286, 289) or completely uncovered. (defendants' exh. no. 284, 285, 286; Tr. Vol IX, 03/11/97, p. 56–8). Covering the stockpiles and bins was of particular issue for DER, for they were a major source of emission.

Most of the sources of emission could have been controlled by the general housekeeping measures suggested by DER. The greater the release of particulate matter from the site, the more matter had to be cleaned up.

Marjol did attempt some housekeeping measures to eliminate emissions such as spreading sodium silicate on the roadways; partially covering the stockpiles; purchasing tenant sweepers to clean heavily trafficked areas of the site; eliminating use of the melting pot; crushing stored battery piles and washing the tires of the delivery trucks. However, Marjol was far from compliance with DER orders. Marjol argued it was "absolutely impossible" to get equipment or engineering work accomplished in the DER-prescribed time limits. (Lee Norman deposition, 11/18/93; p. 264). Although Marjol made weak or begrudging efforts, it rarely was prompt or aggressive in attempting to comply. (Tr. Vol. IV, 03/04/97; p. 212–13).

Such noncompliance was also seen throughout the United States with other battery breakers. Secondary smelters faced significant costs and technological challenges as a result of newly enacted environmental regulations and laws. For example, Marjol had to contend with a change in the National Ambient Air Quality Standards when it attempted compliance with DER orders. Many of the previously operated battery breaking facilities are on Superfund lists, and as of 1986, reports indicate that there remained only between two (2) and five (5) independent battery breaking facilities in operation in the entire United States. (plaintiff's exh. no. 551, p. 8; exh. no. 552, p. 13). Pennsylvania was on the cutting edge of enacting environmental laws, and the Pennsylvania DER was dealing with totally novel issues. Still, most of the housekeeping methods suggested to Marjol and Lawrence Fiegleman were basic and rudimentary in their nature, and did not require technological advancements. They could have been accomplished easily with modest cost.

### 5. the 1980 order

Upon discovering that Gould was going to acquire Marjol, DER performed more investigations, and issued an order dated March 10, 1980. This order was essentially "an end of the line order." An end of the line order meant that the party either had to comply with the order or shut down the business. (Tr. Vol. VII, 04/21/97; p. 172). It was Gould, and not Marjol, who initialized compliance with this order. Compliance came in the form of shutting down the plant after Gould had acquired Marjol. Gould eventually appealed the order. The appeal was resolved through an agreement with DER.

The Marjol site was never ordered shut down by DER. But the fact that Marjol was not shut down does not indicate that DER was ever satisfied with Marjol's operation.

### D. The Acquisition of Marjol

Gould acquired Marjol because its metals division wanted to build a smelter on the east coast. In order to do so, it needed a supply of batteries, and Marjol had the supply. Instead of competing with Marjol, Gould acquired it. Gould intended to purchase Marjol, run it for three years and then shut it down. On May 7, 1980, Marjol was bought from Lawrence Fiegleman for 50,000 shares of Gould stock, an estimated value of one to one and one-half million dollars.

Gould personnel visited and toured the site. Gould was aware and knew of the prior Marjol history with DER. In fact, Gould did not think that the problems with DER were anything out of the ordinary. However, Gould did not know of the buried battery cases until after the acquisition. Had Gould known this beforehand, John Rossini, Gould's environmental and managing engineer, indicated that he would have advised Gould's metals division not to buy the site, due to the potential liability.

Once Gould took over operations, it implemented some procedures in order to control emissions. Such procedures were using tenant sweepers on the site, planting vegetation, placing top soil and seeding to prevent erosion, covering the bins with tarps, paving and curbing. Gould also submitted to DER wheel washing and acid collection construction plans. In regards to the battery cases stored uphill from the site, Gould recycled all of those cases before it shut down the plant. (Tr. Vol. VI, 03/95/97; p. 106).

Gould ceased all operations on the site on April 3, 1981. Except to the extent of maintenance activity, dismantling existing buildings and housekeeping matters, little activity occurred on site. However, emissions of lead still continued after the site was closed. Such emissions were not categorized as violations of the National Ambient Air Quality Standards, as official samplings were not conducted for the requisite amount of time. (Tr. Vol. IIX, 04/22/97; pp. 11–2).

Although such improvements could have reduced the release of particulate matter from the site, the improvements would not have had any effect on contamination that occurred before such improvements were installed. (Tr. Vol. IV, 03/04/97; pp. 215–16).

After having been contacted by DER, the Federal Environmental Protection Agency began investigations of the site in 1988. Since then, Gould has entered into consent decrees pursuant to federal environmental laws and regulations in an effort to clean up the site. Gould has also remediated certain neighboring residences, buying the properties in an effort to clean up the site and its surrounding areas.

### E. Defendants' Actions And Conduct

The battery sellers bought and sold batteries for their lead value. Although a large number of the defendants claim only to have been in the salvage business with a small percentage of their business being battery sales, all defendants were sending or selling, at a minimum, large trailer loads of batteries to the site for reclamation.

### F. The Expert Witnesses' Testimony

#### 1. *George Hall*

Gould presented the testimony of Dr. George R. Hall, Managing Director of Putnam, Hayes & Bartlett, Inc., as its allocation expert. Dr. Hall was asked to provide a waste in list and to analyze the division of the response and remediation costs for cleaning up the site. Dr. Hall compiled a waste-in list, a compilation of the deposits of various kinds of waste by different parties at the site. The waste-in list was compiled from information extracted from the Varzaly ledgers, documents in possession of Gould after the acquisition and certain documents and depositions of the defendants. A database prepared by Gould also was used by Dr. Hall in the compilation of the waste-in list. The waste-in list spans the entire operational period of the site while it was under ownership of both Marjol and Gould, from 1961 through 1981.

##### a) *linear interpolation theory*

For the two gap periods of June, 1970 through May, 1971 and June, 1976 through May, 1979 when there were no Varzaly ledgers available, Dr. Hall linearly interpolated the sales of batteries attributable to a specific defendant. If the corporation had sold batteries to Marjol in the five month period before the gap and in the seven month period after the gap, he concluded that it was likely that the party had sold batteries to Marjol during the gap period. Dr. Hall estimated the sales during the gap period in question by extrapolating between the volumes before the gap period and the volumes after the gap period. If the party did sell batteries to Marjol in the five months prior to the gap period, but did not make a sale in the seven

months after the gap period, then Dr. Hall did not linearly interpolate.

No linear interpolation was done for the gap years of 1961 to 1969. Instead, Dr. Hall disregarded those years. However, for all three gap periods, if there was credible information available either in the form of depositions or documents, sales were credited to a specific party based upon such information.

### b) *waste-in lists*

The main waste-in list (plaintiff's exh. no. 599) is the result of the above described linear interpolation methodology. Other waste-in lists were then produced, converting the total pounds of batteries attributed to a party to unmodified total amount of dollars paid to that party. The unmodified dollar amount waste-in list (plaintiff's exh. no. 596) was adjusted to reflect the time value of the money. The waste-in list's dollar amount was adjusted based upon the American Metal Market Daily Index, ("AMMD") (plaintiff's exh. no. 597), as well as the Producer Price Index ("PPI"). (plaintiff's exh. no. 598).

Dr. Hall indicated that he favors using the AMMD waste-in list over any other list, as dollars are a better guide than pounds because it was money which the suppliers were looking for in dealing with Marjol. Dr. Hall further contends that the AMMD waste-in list is better than the PPI dollar converted waste-in list, as the AMMD specifically related to batteries as opposed to the more general PPI index.

In determining each supplier/arranger's apportioned share of batteries sent to the site, Dr. Hall took the interpolated amount (the numerator) and divided said amount by the total amount of batteries at the site (the denominator). If the supplier/arranger's amount was interpolated, then Dr. Hall also added that interpolated amount to the total amount of batteries (the denominator) at the site.

Dr. Hall's methodology concludes that 929,574,549 pounds of batteries were processed at the site during its operation. In Dr. Hall's approach, this is the denominator figure used in order to determine each party's share of liability.

### 2. *Cost Analysis: Allocation*

After having determined what waste-in list controls the determination of the amount of batteries generated through the site and what amount each party contributed to the site throughout the site's operation history, it must next be determined how the clean up costs incurred at the site are to be allocated among the parties. Past and future response and remediation costs at the Marjol site must be divided among the parties.

Dr. Hall opined that three (3) allocation methods merit review and attention with respect to the Marjol site: direct-cost causation; benefits analysis; and the Gore Factors.

### a) *direct-cost causation*

The direct-cost causation analysis is utilized only when one can specifically identify some potentially responsible party's waste or action and that it can be traced or established in some specific way that such action or waste is linked to clean up costs. Dr. Hall indicated that the direct-cost causation is not applicable here, due to difficulty in establishing such direct causal links to the defendants.

### b) *the Gore Factors*

The Gore Factors, named after then Congressman Al Gore, dictate that certain considerations should be taken in to consideration by the court in determining allocation decisions. The Gore Factors are:

i. distinguishability of the party's contribution to a release, discharge, or disposal of hazardous waste;

ii. the amount of hazardous waste involved;

iii. the toxicity of the hazardous waste involved;

iv. the involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

v. the degree of care exercised by the parties, and

vi. cooperation by the parties with federal, state or local officials.

The Gore Factors have been cited by many courts such as *Kerr–McGee Chemical Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 326 (7th Cir.1994), *U.S. v. Colorado & Eastern Railroad Co.*, 50 F.3d 1530, 1536, n 5 (10th Cir.1995), and *Central Maine Power, Co. v. F.J. O'Connor Co.*, 838 F.Supp. 641, 645–7 (D.Me.1993).

Although Dr. Hall stated he does not feel that the Gore Factors are instructive in determining allocation for the Marjol site, he testified that the Gore Factors are best to be used to modify a basic quantitative division which has been reached by the cost analysis allocation method. Of all the Gore Factors, Dr. Hall opines that Factor five is the only one which should be given consideration by the court in modifying any basic division it has reached. In utilizing Gore Factor Five, Dr. Hall suggests a three step approach: (1) it must first be established that the degree of care exercised by Marjol in the 1960's and 1970's was out of line with ordinary practice at that time; (2) the lack of care increased remediation costs to an amount it would have been had Marjol exercised the appropriate degree of care; and (3) the quantum of extra costs should be quantified and then that assigned amount should be used to modify any equitable split in costs which the court deems appropriate.

Dr. Hall stated that any imprudent decision by Lawrence Fiegleman should he evaluated against the standards of the time when the acts or omissions occurred.

#### c) *economic benefits approach*

The basic rationale of the economic benefits approach theory is that it is reasonable to associate the cost responsibility for a clean up to the relative economic benefits received by the various potentially responsible parties. Dr. Hall opined that the economic benefits theory should be given serious consideration by the Court in determining allocation of costs.

The Economic Benefits approach dictates that a potentially responsible party's responsibility should be related to the economic benefits it received from the site. In utilizing this approach, one must recognize the fact that Marjol was a market place comprised of buyers and sellers; the buyer being owner/operator (Marjol and Gould), and the seller being the suppliers/arrangers (the defendant battery sellers). At this marketplace, the buyers and sellers would interact, the site being a locus where buyers of waste could interact with sellers of waste batteries. Both owners/operators and suppliers/arrangers have benefitted from this arrangement and market place for nineteen years, as each was receiving an economic benefit from the other.

Because of this ongoing symbiotic relationship, Dr. Hall testified that under the Economic Benefits Approach, there should be a 50/50 division among the owner/operators and the suppliers/arrangers; Gould being responsible for 50% and the defendants being responsible for 50%.

Dr. Hall then testified that the Court may utilize Gore Factor number five to modify this 0/50 split based upon the economic benefits approach, but only if the above discussed three step approach is met. Additionally, Gould's proposed share would also be increased by the orphan shares.

#### 1. *Dr. Kenneth Wise*

Defendants presented testimony from Dr. Kenneth Wise, managing director of the Brattle Group, an economic consulting firm.

Dr. Wise testified that the economic benefit theory is not a principled basis for allocating cleanup costs. He opines that there is no economic basis to support the theory that all parties received an economic benefit from their dealings at the site. However, Dr. Wise does agree that the site functioned as a market for all parties.

Dr. Wise believes that the proper place to start is to take into consideration factors that bear on which party may have had more or less responsibility for creating the hazardous problem. He also stated that other equitable factors, in addition to The Gore Factors, such as knowledge of the problems of the site, ability to control site operations, efforts or lack thereof to take such actions which would have reduced the amount of cleanup costs should be considered.

### 2. *M. Alexis Maniatis*

The defendants' other expert, Mr. M. Alexis Maniatis, testified in regards to Dr. Hall's waste-in lists, to Dr. Hall's methodology and to the estimated amount of batteries purchased by Marjol. Mr. Maniatis developed his own waste-in list from information gathered from the Varzaly check ledgers, the general ledgers kept by Marjol during the gap years of June, 1970 to May, 1971 and June, 1976 to May, 1979, and Marjol's federal income tax returns for the years 1965, 1966 and 1968.

Although both the Marjol general ledgers were available to Dr. Hall when he prepared the plaintiffs waste-in lists, Dr. Hall did not utilize them.

In preparing the defendants' waste-in list, Mr. Maniatis converted the dollar amount of the Marjol sales into pounds of batteries by using either the actual price Marjol paid for the batteries at a certain time or the price of scrap batteries as listed by the American Metal Market Daily publication.

For the years where Marjol's tax returns were available, Mr. Maniatis used the tax returns, converting the dollar amount to pounds. For the years when both the tax returns and the Varzaly ledgers were available but there was a difference in the amount reported after the dollar amount was converted to pounds, Mr. Maniatis reduced the amount of the converted tax returns in order to match the reported amount of the Varzaly ledgers for consistency with the Varzaly ledgers, as the Varzaly ledgers were seen as a more accurate record of the Marjol transactions.

For the gap years of 1961 to 1969 for which there were no tax returns, general ledgers or Varzaly ledgers, Mr. Maniatis utilized a linear interpolation methodology to estimate the amount of batteries purchased by Marjol. If there were tax returns for any years prior to 1969 Mr. Maniatis took the average of the linear interpolation and the converted tax return. Mr Maniatis' linear interpolation was based upon an annual amount, as opposed to Dr. Hall's five month/seven month interpolation.

Mr. Maniatis' methodology concludes that 1,201,305,722 pounds of batteries were processed at the site during its operation. He used this number as the denominator in determining each party's allocated share of liability. Of this amount, approximately 664,000,000 pounds are attributable to known parties, while approximately 538,000,000 pounds of batteries were purchased by Marjol for which no specific supplier is identified. Mr. Maniatis argued that using dollar amounts was more accurate than pounds since, he claimed, more records, i.e. tax returns, were available and limited the need for speculation or interpolation.

## CONCLUSIONS OF LAW

### A. Arguments Of The Parties

The law provides that all of those involved in the business, including the arrangers as well as the operators, are responsible for the reclamation costs and the damages incurred as a result of the damage to the land and to the environment. The difficulties in trying to allocate the percentage of responsibility in a case like ours are manifold. For instance, it's difficult because of the lack of continuous records to determine exactly how much each of the named defendants supplied to the operator. It is also necessary to consider the knowledge and the actions of the individual parties.

The law allows us to consider all of the equities involved, and in this case the defendants argue that they, as defendants: (a) were unaware of what the owner was going to do with the batteries; (b) were unaware of exactly how the operator maintained and operated his premises; and (c) were unaware of the fact that the DER had been accusing the operator of a large variety of violations of environmental laws and simple housekeeping details that were resulting in significant damage to surrounding people and properties. As a result, the defendants claim that on an equitable basis, they should not be expected to pay the same share of the reclamation costs of the operator because of its careless, negligent and, indeed, reckless conduct.

On the other hand, the plaintiff owner/operator argues that in spite of multiple of letters and statements by the DER about

violations, it tried to maintain a state-of-the-art operation considering the fact that little was known about the methodology of battery breaking and less was known about dangers to the environment at the time. The operator's argument is to the effect that the operator did not think that he was doing anything wrong and indeed, made every effort to keep up with developing technology to make the operation as safe and clean as possible.

It's on the basis of this latter argument, that the operator and the operator's expert economic witness would have us allocate the cost on a 50/50 basis, arguing that both the operator and the arrangers were all in the business for the same purpose, to make a profit, and that none intended to do any harm but they all contributed in the same way to the harm. Therefore, they should share equally in the cost of reclamation.

It is within this background summary of the parties' arguments that we state our conclusions of law.

## B. Established Liability Of The Parties[4]

■ At one time or another in this matter, each of the remaining defendants has been found liable as an arranger pursuant to 42 U.S.C. § 9607(a)(4).

It has been held by our circuit that "[t]he concerns that have led to a corporation's common law liability for the torts of its predecessor are equally applicable to the assessment of responsibility for clean-up costs under CERCLA." *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 91 (3d Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989). Gould acquired Marjol in an asset for stock transaction. Gould has recognized that it is the legal successor to Marjol, and therefore is liable both for the actions of Lawrence Fiegleman and for any damage or harm attributed to the operations of the site. (Tr. Vol. XI; pp. 208–16).

■ "Once liability is established, a party's share of liability is apportioned according to those equitable factors the court deems appropriate." *Farmland Industries, Inc. v. Colorado & Eastern Railroad Co.*, 944 F.Supp. 1492, 1498 (D.Colo.1996). This is the basic thrust behind a § 113 contribution claim. "[W]hile a potentially responsible person should not be permitted to recover all of its costs from another potentially responsible person, the person should be able to recoup that portion of its expenditures which exceeds its fair share of the overall liability. Section 113 provides potentially responsible persons with the appropriate vehicle for such recovery." *New Castle County*, 111 F.3d at 1121.

## C. Allocation Of Cleanup Costs

### 1. *Waste-in lists*

During Phase II of the bench trial, the parties presented expert witnesses on how to determine the total amount of batteries at the site and the total amount of batteries sent to the site by each defendant. We were presented with several waste-in lists from Dr. Hall and Mr. Maniatis, which estimated the total amount of batteries in pounds and in dollars. In adopting the most accurate waste-in list, the Court realizes that use of said waste-in list will result in the fairest allocation among the parties.

Mr. Maniatis' methodology of determining the volume of batteries processed at the site during its operation is, in the Court's opinion, the most accurate. Mr. Maniatis has taken into account more available documents and information (and thus reduced speculation-especially on the gap periods) and, using his "averaging methodology", has given the Court a more accurate account of the spent batteries not only for the site itself, but also

---

4. By Order of Court dated September 14, 1995, we held that Gould was not permitted to bring a cost recovery action pursuant to § 107 of CERCLA, but was solely limited to a § 113 contribution claim. *Gould, Inc. v. A & M Battery & Tire Service, et. al.*, 901 F.Supp. 906 (M.D.Pa.1995). The right to bring a contribution claim belongs to Gould, for a potentially responsible person may bring a § 113 claim "when the person believes that it has assumed a share of the cleanup or costs that may be greater than its equitable share under the circumstances." *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1122 (3d Cir.1997) (citations and quotations omitted).

for each specific defendant. Therefore, in determining the parties' individual allocated share of response costs, the Court as well as the parties shall use defendants' waste-in list. (defendants' exh. no. 399).

### 2. *division of cost*

#### a) *legal principles governing allocation of response costs*

■ "CERCLA's allocation scheme is an equitable determination, in which the district court must make its own factual findings and legal conclusions." *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 938 (8th Cir. 1995) (internal quotations and citation omitted). CERCLA provides that "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate ." 42 U.S.C. § 9613(0(1). *See also New Castle County,* 111 F.3d at 1121 (discussing the difference between a § 107 cost recovery action and a § 113 contribution action). Although the law is clear that equity dictates the court's determination in allocating response costs, the very nature of "equity" itself is not always as clear.

> The hallmark of a court of equity is its ability to frame its decree to effect a balancing of all the equities and to protect the interest of all affected by it, including the public. Congress reemphasized that the trial court should invoke its moral as well as its legal sense by providing that the court use not just equitable factors, which phrase already implies a large degree of discretion, but such equitable factors as the court determines are appropriate. This language broadens the trial court's scope of discretion even further.

5. For example, counsel for the Marjol Site PRP Group has cited the decision of *PMC, Inc. v. Sherwin–Williams Company,* 1997 WL 223060, 1997 U.S. Dist. LEXIS 6013 (N.D.Ill.1997). In *PMC,* the court awarded a zero percent allocation to PMC and 100 percent allocation to Sherwin–Williams, as "Sherwin–Williams [was] solely responsible of those hazardous substances because they are not used or produced by PMC in its operations." *PMC,* 1997 WL 223060 at *11, 1991 U.S. Dist. LEXIS 6013 at *31. A review of the *PMC* case reveals that PMC had zero liability

*U.S. v. R.W. Meyer, Inc.*, 932 F.2d 568, 572 (6th Cir.1991) (internal quotations and citation omitted).

■ We thus may consider just about *any* factor which arises from the testimony and evidence and we deem appropriate in fashioning our equitable decree. *Id.,Accord, Central Maine Power, Co. v. F.J. O'Connor Co.,* 838 F.Supp. 641, 645 (D.Me.1993); *Pneumo Abex .v. Bessemer & Lake Erie Railroad Co., Inc.,* 936 F.Supp. 1250, 1268 (E.D.Va.1996); *Farmland Industries,* 944 F.Supp. at 1498; *Environmental Transportation Systems, Inc. v. ENSCO, Inc.,* 969 F.2d 503, 509 (7th Cir.1992). We are not limited solely to the parties' suggestions or to the equitable factors used by other courts. There is no mathematical precision in our allocation task. Both plaintiff and defendants have relied upon other courts' decisions of the division costs, and urge this Court to adopt the same mathematical split those courts reached in their decisions.[5] However, we note that "the allocation of clean-up costs is a type of decision particularly suited to a case-by-case determination...." *Environmental Transportation Systems,* 969 F.2d at 509. *See also* H.R. Report No. 99–253(I), 99th Cong., 1st Sess. 1, 80 (1980), *reprinted in* 1986 U.S.Code Cong & Admin. News 2835, 2862 ("courts are to resolve [contribution] claims on a case by case basis, taking into account relevant equitable considerations"). Therefore, in allocating the clean-up costs in a CERCLA contribution claim, although other court decisions are highly instructive, we are not bound by another court's reasoning, except that of the Third Circuit, in determining the apportionment of liability for this specific site. We are merely bound by the principles of fairness and equity.

because PMC was found not to have caused the disposal of the hazardous waste in question because it was not used by its company on the patch of land PMC owned on the site. The *PMC* facts are completely distinguishable from our case, as every defendant in the Marjol Site PRP group has been found to have either deposited or caused to be deposited spent batteries at the site, and therefore will be liable for its share of clean-up costs in a manner the Court deems equitably sound.

#### b) *starting point for division of cost*

Before addressing any individual equitable factors, we must first determine a starting point for allocating response costs. We have heard several hours of testimony from several expert witnesses on how to actually determine allocation. Utilizing our broad discretionary power, we are of the opinion that no one party's expert offered a better opinion or method than the other. Rather, we find that a combination of *both* parties' economic experts is the most equitable solution in allocating response costs among the parties.

A rational starting point for determining allocation of costs would be an even split of 50–50 as suggested by Dr. Hall. The Court finds that the Marjol site was a market place in and of itself, and all who dealt with Marjol substantially benefitted from its existence. During its operational years, Marjol paid more than the average battery breaking facility. This in turn gave Marjol a competitive edge among its fellow battery processing facilities, and brought more scrap dealers into its own domain. Scrap dealers and recyclers flocked to Marjol in order to get the best and highest price for lead, and some were even provided pick up and transportation service by Marjol, as Marjol sent its trucks to some of the defendant scrap dealers to pick up the spent batteries.

■ In turn, Marjol benefitted as its customer base grew. Processing between 15,-000 and 25,000 spent batteries a day, it became one of the biggest independent battery breaking operations in the United States. Both the operator and the suppliers benefitted from Marjol's market place for nineteen years, as each was receiving an economic benefit from the other. While Marjol was able to pay above the average price for spent batteries, scrap dealers were receiving that benefit. Most of the defendants had a long standing business relationship with Marjol over the years, choosing to stay with Marjol instead of utilizing another battery processing plant. While the market place flour-

ished, no one involved was much concerned about environmental harm-indeed, no one involved wanted to hear much about it.

■ In our past rulings, even before we had heard such a suggestion, we recognized that a economic benefit was received from Marjol dealings. *See e.g. Gould, Inc. v. A & M Battery & Tire Service, et. al,* 954 F.Supp. 1020, 1023 n. 3 (M.D.Pa.1997) (where we held that a defendant broker received a profit margin from its dealings with Marjol, "whether [such profit margin] was 1%, 10% or 100%"). The Court is still of the opinion that any party who dealt with Marjol did receive an economic benefit, and because of such a benefit, should be liable for its allocated share of response costs.[6]

■ Dr. Wise testified that this Court should take into consideration several factors in determining the allocation of clean up costs. We agree. We believe that in determining the liability of the parties, as the site was a market place where all benefitted from its use, the Court should begin with the basic premise that the plaintiff is liable for 50% of the clean up costs, that the defendants are liable for 50% of the clean up costs and that this 50/50 split is to be adjusted by certain equitable factors. "It is a fundamental principle of the legal system that courts are to leave harms and losses where they find them unless some good reason appears for shifting a loss from one party (or a set of parties) to another party (or a set of parties)." *Acushnet Co. v. Coaters, Inc.* 948 F.Supp. 128, 136 (D.Mass.1996).

#### c) *analysis of the Gore Factors*

Having determined that the plaintiff–recommended 50/50 split should be adjusted, we look to certain factors to make such an adjustment. "[I]n any given case, a court may consider several factors, a few factors, or only one determining factor ... depending on the totality of circumstances presented to the court." *Environmental Transp. Systems,* 969 F.2d at 509. While we are strong-

---

6. We are not unaware of or unsympathetic to many defendants' assertion that their conduct occurred many years ago, and that they never expected to pay for environmental damage after the passage of such a long period of time. But liability is *absolute* under the act, *United States v. A & F Materials Co., Inc.,* 578 F.Supp. 1249, 1255 (S.D.Ill.1984), and there is no relief because someone failed, or didn't want, to see what was happening.

ly persuaded by the Gore Factors, we note that "[t]he Gore Factors are not exhaustive." *Central Maine Power Co. v. F.J. O'Connor Co.,* 838 F.Supp. 641, 645 (D.Me.1993) (*citing Environmental Transp. Systems,* 969 F.2d at 509).

Although Gould contends that Gore Factor Five, the degree of care exercised by the parties, is the only Gore Factor worthy of consideration so long as its degree of care is based upon the established standard of care in the 1960's and 1970's, we find that such a limitation is equitably unfair. All of the Gore Factors are relevant, and all of the Gore Factors are worthy of the Court's consideration.

> i. *distinguishability of the parties' contribution to a release, discharge or disposal of hazardous waste*

Several types of documents indicate the defendants' contribution of spent batteries to the site. Specifically, the Varzaly ledgers and the Marjol general ledgers reveal the magnitude of batteries sent to the site over the years, and, in most instances, also reveal specific deliveries and amounts attributable to specific defendants. As reflected by Mr. Maniatis' waste-in list, we are able to determine the certain percentage of each parties' dealing. These documents alone are justification for making a defendant pay for his share, as they are, in the Court's opinion, a direct link between the defendants and Marjol, and the harm done to the environment.

Although counsel for the defendant Marjol Site PRP group indicates that courts have allocated 100% of the clean-up costs to one party while allocating zero percent to another, in those cases, it was found that the non-paying party was not using the site or causing hazardous waste to be disposed of at the site. *See, e.g., Bethlehem Iron Works, Inc. v. Lewis Industries, Inc.,* 1996 WL 557592, ** 71–3 (E.D.Pa.1996) (where the court found that since Lewis Industries did not use the northwest corner of a hazardous site where certain hazardous materials were found, it was not liable for any amount of clean up costs); *PMC, Inc. v. Sherwin–Williams,* 1997 WL 223060, **4, 5, 12, 1997 U.S. Dist. LEXIS 6013, **7, 8, 11, 12 (where the court found that PMC had zero percent liability as Sherwin–Williams was the sole disposal source of the hazardous waste in question).

Additionally, as Gould has presented evidence to affirmatively show that the members of the Marjol Site PRP group substantially contributed batteries to the site, there is no basis to assume that such defendants are not liable for their share of Gould's contribution claim. *See Fallowfield Development Corp. v. Strunk, et. al.,* 1993 WL 157723 (E.D.Pa.1993) (where the court denied Strunks' motion to amend their answer and counterclaim to add a CERCLA contribution claim, as the Strunks had failed to produce testimony at trial that would entitle them to a contribution claim).

> ii. *amount of hazardous waste involved*

As Mr. Maniatis' waste-in list reveals, 1,201,305,722 pounds of batteries have been processed at the site during the site's operation, of which approximately 664,000,000 are attributable to the defendants. No expert is needed in this case to know that such an amount is phenomenal.

> iii. *toxicity of the hazardous waste involved*

Although during the 1960's and early 1970's, people were not aware of, or concerned about, the hazardous nature of lead and lead particulate matter, it eventually became known that lead is a hazardous matter which, if not disposed of in an appropriate matter, could cause damage to the environment and to the community at large. While we question whether it is fair to hold Marjol and Lawrence Fiegleman to today's standards concerning the hazardous nature of lead, we can make a determination that when certain environmental departments and agencies became aware of the dangers of lead and began to regulate the businesses that dealt with lead, Lawrence Fiegleman should have realized that he was operating with hazardous materials, instead of playing dumb in his insistence that he did not have a potentially hazardous problem on his hands.

In any event, the Court has heard testimony concerning the hazardous nature of lead,

and we do not think that any reasonable party would disagree with the fact that lead is recognized and listed as a hazardous substance pursuant to § 101(14) of CERCLA. *See* 40 C.F.R. § 302.4(a) (Table) (1996) (indicating that lead, lead compounds and other leaded substances are hazardous substances under CERCLA).

It has been held that "in a dispute between waste generators and the site operator, the last three Gore Factors are most important." *Central Maine Power Co. v. F.J. O'Connor Co.*, 838 F.Supp. 641, 646 (D.Me.1993) (quoting *Amoco Oil Co. v. Dingwell*, 690 F.Supp. 78, 86 (D.Me.1988)). It is these three factors which the Court deems most relevant in our allocation task.

iv. *the involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste*

The Court has also heard testimony concerning Marjol's handling of the batteries and the manner in which the defendants delivered batteries to the site. Testimony revealed that once the lead plates were extracted from the batteries, battery casings were thrown out behind the back of buildings, and were permitted to accumulate in storage bins, pits and ravines. The battery piles were left to literally grow over the sides of the storage bins. Photographs show literally mountains of battery casings all over the site which often were left uncovered for long periods of time. Deposition testimony of DER officials revealed that once Marjol was acquired by Gould, battery scraps were strewn about the site.

Evidence revealed that the defendants sent trailer loads of spent batteries to the site. Some defendants dealt with brokers; others dealt directly with Marjol by using its own trucks or by taking advantage of Marjol's "pick up service".

As part of their defense, many defendants argue that they didn't crush the batteries themselves, or did not cause lead to be released, and want the Court to accept their argument that they didn't know how Marjol ran its business. They viewed the transactions and business as a contractual nature or enterprise; that they had the legal right to conclude that Marjol would operate the site in a fashion not to cause harm to either them, the environment or the community at large. However, the record shows that these defendants knew how lead was reclaimed from the battery and that the lead reclamation business is dirty by its nature. The defendants all knew the batteries had to be crushed or broken open to reclaim the lead. They also knew that residue, in the form of broken casings and "acid liquid" resulted from this process, and that they did not want to deal with this residue. It was easier and more profitable to ship the batteries somewhere else for crushing and reclamation.

Just as Gould cannot escape the fact that Marjol employees and Lawrence Fiegleman stored and disposed of lead in a way that caused the release of lead and lead particulate, the defendants cannot escape the fact that they sent the batteries to the plant; that it was their batteries which were sold to Marjol. Whether the parties are judged by today's standards or the standards of 1960's and 1970's, the basic fact still remains that Marjol haphazardly disposed of batteries purchased from the defendants.

v. *degree of care exercised by the parties*

In the Court's opinion, Gore Factor five, the degree of care exercised by the parties is an important factor. Dr. Hall also stated that this factor is important, but only if the plaintiff, Gould, as well as its predecessor, Marjol, is judged by the standards established at the time of its questionable actions. While we realize that during the 1960's and 1970's there were no clearly established environmental standards in regards to water, air and soil contamination, the fact cannot be overlooked that much of what could have been done to reduce fugitive emissions from the site was blatantly ignored by Lawrence Fiegleman.

Dr. Hall stated that in order for Gore Factor five to be considered, it must be established that the degree of care exercised by Marjol in the 1960's and 1970's was out of line with ordinary practice at that time and that the lack of care increased remediation

costs beyond what it would have been had Marjol exercised the appropriate degree of care. Given the fact that the Pennsylvania DER was on the cutting edge of environmental regulations, that James Chester and John Wilkes of DER were conducting visits and inspections of the site on a regular basis, and that Marjol was the subject of several DER orders and criminal complaints for violation of said orders, it was unreasonable for Lawrence Fiegleman to continue to insist that lead was harmless. He should have realized that a volatile problem was at hand, and that regulatory officials were advising him what had to be done not only in order to reduce fugitive emissions and contamination, but also in order to keep Marjol operating in a manner deemed acceptable by DER.

At a time when new environmental regulations were being implemented and environmental officials were questioning its operations, we believe that Marjol, under Lawrence Fiegleman, should have made a better effort in attempting compliance, or at least of becoming concerned that the operation, the largest independent battery breaker at that time, did not comply with DER standards and orders. Instead, there was only a begrudging and much delayed attempt at compliance.

Lawrence Fiegleman, who made all the important decisions at Marjol, refused to acknowledge the fact of the health and environmental effects of lead. He steadfastly refused to believe that lead deposits pose a deleterious effect, that lead could contaminate not only the site, but also the surrounding areas of the site, and that lead exposure presented serious health risks. In addition, there were things which could have been done or changed to prevent the damage which did not require technological information or enormous amounts of money or resources. These measures, which have been referred to by several expert witnesses as "housekeeping matters", such as covering the bins, preventing water and water runoff from being contaminated, cleaning the driveways, and cleaning the dust off of the equipment, were available at a minimal cost.

These recommended and basic housekeeping measures could have greatly reduced emission; contamination would not have been so widespread, and clean-up costs incurred by Gould would not have been so extensive.

Therefore, based on equity principles, the plaintiff's lack of care warrants an increase in the Gould's share of clean-up costs, and the defendant suppliers should not be burdened with a cost equal to the plaintiff, since the past owner and operator of the site continually refused to enforce or implement such housekeeping measures.

As part of their defense, many defendants argue that they didn't crush the batteries themselves, or did not cause lead to be released, and want the court to accept their argument that they didn't know how Marjol ran its business. They viewed the transactions and business as a contractual nature or enterprise; that they had the legal right to conclude that Marjol would operate the site in a fashion not to cause harm to either them, the environment or the community at large.

Still, the defendants had long standing relationships with Marjol. Within the battery breaking industry, as time progressed, all became concerned about those in the industry, as a product of their business was lead emission which was regarded as dangerous to the community at large. Therefore, many like the defendants sought out places to dispose of the batteries with full knowledge that the only use of a spent battery was to extract the lead. Additionally, because Marjol utilized the same manner of breaking batteries as recognized in the battery breaking industry at large, these defendants had general knowledge of such an operation, and its potential results.

One equitable factor which the Court may consider is "the benefits received by the parties from the contaminating activities and the knowledge and/or the acquiescence of the parties in the contaminating activities." *Weyerhaeuser Co. v. Koppers Co., Inc.*, 771 F.Supp. 1420, 1426 (D.Md.1991) (citation omitted). The defendants contend that they should not be responsible for any of the clean-up costs. The record shows, however, that they had received great economic benefit from bartering with Marjol and that it was

their batteries which were sent to the site by the trailer load.

We realize that another factor the Court may consider is the financial resources of the parties, *see e.g., B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1206 (2d Cir.1992) (where the court held that although municipalities may be found liable under CERCLA, future application of such an equitable factor to determine liability may be considered in allocation of costs), and that a few defendants claim to have limited financial resources. But the fact remains that those defendants reaped a great benefit from their past dealings with Marjol.

Throughout Phase II of the bench trial, the Court heard testimony and saw evidence presented in a way which suggests that the parties should not be held accountable for either their own actions or their predecessor's actions, even though all benefitted greatly from said actions. While we realize that we face a great task of holding parties responsible for their actions and dealings which occurred decades ago in a time when such actions or dealings were second nature to all, we are left in today's time and today's standards with a contaminated site surrounded by a residential neighborhood that still is undergoing remediation investigation. Drastic times call for appropriately strong measures, and, in equity, it would not be fair for any party, especially the defendants, to escape liability by claiming that they were unaware of how Marjol ran its business.

Such arguments are not equitably fair in such a scenario where there are records and other documents indicating that the defendants sent trailers of spent batteries to the site. However, we can say that it is equitably fair that the defendants' liability should be reduced when their conduct is compared with that of the plaintiff.

vi. *cooperation by the parties with federal, state or local authorities*

The last Gore Factor, the cooperation factor, is also of import in our determination. While Lawrence Fiegleman was stubborn in his beliefs and was irrational in his dealings with DER we do recognize that Gould has been up front and valiant in accepting responsibility for a bad business deal, and its officers should be commended for their actions. But under the law Gould is responsible for its predecessor's actions, *Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86 (3d Cir.1988), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989), and in light this law Gould's valiant efforts must be encumbered by Marjol's past actions.

We feel this analysis comports with the law that binds us; that it follows the general testimony and opinions of experts Dr. Hall and Dr. Wise; and that it is a common sense review of the totality of the circumstances surrounding the operations of the site and the relationship of the parties to this action. *Environmental Transportation Systems, Inc. v. ENSCO, Inc.,* 969 F.2d 503, 509 (7th Cir.1992); *U.S.v. Colorado & Eastern Railroad Co.,* 50 F.3d 1530, 1536 (10th Cir.1995); *Kerr–McGee Chemical v. Lefton Iron & Metal Co.,* 14 F.3d 321, 326 (7th Cir.1994) (courts have weighed the Gore Factors on a case by case analysis, based upon the totality of the circumstances).

It is not easy to attach precise mathematical results to this reasoning. But it is clear that the Plaintiff should be responsible to a greater extent than the defendants.

Based upon the totality of the circumstances of this case, that all who dealt with Marjol benefitted; that Gould is to bear the responsibility of its predecessor's actions; and that such actions have severely contaminated the site and surrounding areas, we find, based upon the principles of equity reviewed herein, that Gould should bear 75% of the clean-up costs and that the defendants should bear the remaining 25% of the costs, to be apportioned among the individual defendants in accordance with their attributed amount as indicated by the waste-in list of Mr. M. Alexis Maniatis. Gould's share of costs is also increased by the orphan share of batteries contained at the site, in line with

our previous ruling that it is liable for the orphan share.[7]

---

**7.** We, of course, have taken into consideration all of the parties' arguments. However, counsel for the Marjol Site PRP Group Defendants urge this Court, "in the interest of comity" and in the interest of public policy, to consider the Pennsylvania Hazardous Sites Cleanup Act, 35 P.S. § 6020.101 *et seq.*, Section 6020.702(5)(D) of that act states that a seller of an intact, spent lead acid battery for recycling shall not be liable for cleanup costs at the facility. This is not a matter of comity, but rather a matter of preemption, and in this CERCLA action, federal law preempts any state law when there is such a sharp conflict concerning a party's liability. *See e.g. Witco Corp. v. Beekhuis*, 38 F.3d 682 at 686–90 (3d Cir.1994) (discussing general principles of preemption and CERCLA).